# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

Plaintiff and Respondent,

v.

RUN PETER CHHUON and SAMRETH SAM PAN,

Defendants and Appellants.

S105403

Los Angeles County Superior Court
KA032767

June 1, 2026

Justice Groban authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan and Kruger concurred.

Justice Liu filed a concurring and dissenting opinion, in which Justices Evans and Jenkins[*] concurred.

.

---

[*] Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. CHHUON and PAN

S105403


Opinion of the Court by Groban, J.


Defendants Run Peter Chhuon and Samreth Sam Pan were tried jointly before separate juries. They were convicted of the first degree murders of Nghiep Thich Le and Hung Dieu Le (Pen. Code, § 187, subd. (a));[1] the willful, deliberate, and premeditated attempted murder of Quyen Luu (§§ 664, 187, subd. (a)); first degree burglary (§ 459); and attempted robbery (§§ 664, 211). The separate juries also found true allegations that Chhuon and Pan voluntarily acted in concert with two or more persons to commit a robbery within an inhabited dwelling house (§ 213, subd. (a)(1)(A)); a principal was armed with a handgun in the commission of the crimes (§ 12022, subd. (a)(2)); and Chhuon personally used a firearm in the commission of the crimes (§ 12022.5, subd. (a)). In addition, Chhuon and Pan were convicted of the first degree murder of Miguel Vargas Avina (§ 187, subd. (a)) and the willful, deliberate, and premeditated attempted murder of Rodolfo Huerta (§§ 664, 187, subd. (a)). The separate juries found true the allegations that a principal was armed with a handgun in the commission of this murder (§ 12022); Pan personally used a handgun in the commission of this murder and attempted murder (§ 12022.5, subd. (a)); and Chhuon and Pan acted for the benefit of, at the direction of, and in association with a criminal street gang with the specific

_____

[1]    All undesignated statutory references are to the Penal Code.

1

intent to promote, further, and assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)).

The separate juries found true the special circumstances that Chhuon and Pan committed multiple murders (§ 190.2, subd. (a)(3)), and the murders of Nghiep[2] and Hung were committed while Chhuon and Pan were engaged in burglary and attempted robbery (§ 190.2, subd. (a)(17)(A), (G)). The trial court found true the special circumstance that Chhuon and Pan previously had been convicted of first degree murder (§ 190.2, subd. (a)(2)). The separate juries returned verdicts of death, and the trial court entered judgments of death.

This appeal is automatic. (§ 1239, subd. (b).) For the reasons that follow, we vacate the true finding on Chhuon's gang enhancement but otherwise affirm his judgment. We reverse Pan's judgment in its entirety because defense counsel violated Pan's right to decide the objective of his defense. (See *McCoy v. Louisiana* (2018) 584 U.S. 414 [138 S.Ct. 1500] (*McCoy*); *post*, pt. III.B.2.)

## I.   FACTUAL BACKGROUND

### A. Guilt Phase

#### 1. Prosecution Evidence

Chhuon and Pan committed their crimes on July 27, 1995, in Sacramento and August 8, 1995, in Pomona.

##### a. Sacramento crimes

The Le family sold candy, cigarettes, and similar items out of their Sacramento apartment. On July 27, 1995, Chhuon, Pan,

---

[2]   We refer to individuals who share a last name with others by their first names for clarity and not out of disrespect.

Bunjun Chhinkhathork, and William Evans discussed robbing the apartment. Chhinkhathork testified that in order to surveil the apartment, Chhinkhathork and Evans went there and bought soda and cigarettes. Vincent Le testified that a suspicious man visited the apartment, bought candy, and walked to a light blue Honda Accord where another man stood; Vincent identified the man who visited the apartment as Pan and the man who stood by the car as Chhuon. In July 1995, Pan had permission to use a blue Honda Accord.

Chhinkhathork testified that he told the men there were three people in the apartment. The men discussed a plan to go into the apartment, "force them to give up everything and if they didn't follow orders or directions they would start shooting." Chhinkhathork stayed in the blue Honda, while Chhuon, Pan, and Evans left for the apartment. Chhuon had a nine-millimeter handgun.

Amie Le testified that while she and a little boy were sitting on the stairs, three men, in single file, approached her family's apartment. The first man — whom Amie later identified as Chhuon — held a gun and said, "Shut up." Evans testified that Chhuon, but not Evans and Pan, entered the apartment. Quyen Luu testified that one man — whom she later identified as Chhuon — entered the apartment. From an upstairs apartment, Vincent saw his mother, Luu, struggling with Chhuon, and another man standing outside of the fence by the apartment's patio. Luu testified that Chhuon shot her in her hip and then shot her husband, Hung Dieu Le, and father-in-law, Nghiep Thich Le. Chhinkhathork testified that after hearing gunshots, he saw Chhuon, Pan, and Evans run back together toward the car. Hung died from a gunshot wound to his chest, and Nghiep died from a gunshot wound to his head.

On August 16, 1995, law enforcement officers approached Chhuon and Evans in or around a brown Toyota Celica; searched the car and found one nine-millimeter casing and two nine-millimeter bullets; and brought Chhuon and Evans to the sheriff's department for interviews. When interviewed that day, Chhuon said that he and Pan approached the apartment, and Pan ran into the apartment and began shooting. Subsequently, on September 7, 1995, Chhuon said that they planned a robbery, but before they were able to enter the apartment, they heard gunshots and realized that somebody else had gotten there. When interviewed on September 4, 1995, Pan said that he had walked to a wooden gate, but he had blacked out and did not know what happened. The interview videotapes of each defendant were played for their respective juries.

### b. Pomona crimes

On August 8, 1995, Rodolfo Huerta and his friend Miguel Vargas Avina were in Huerta's truck. Avina had a rifle because they were going to go rabbit hunting, and he placed it behind the seat. As they began to drive, a small, brown car pulled alongside and shot at them. Avina died of a gunshot wound to his torso.

Kunthea Sar testified that after being picked up from Nhung (also known as Karol) Tran's house, Sar and D.T. were driving in a brown Toyota Celica with Chhuon in the driver's seat and Pan in the front passenger's seat when they saw a Hispanic man standing near a truck holding a rifle. Sar identified Huerta's truck as the truck by which the Hispanic man stood. The Hispanic man was not pointing the rifle at anybody. Chhuon said, "Let's go home"; Chhuon and Pan giggled; Pan also said, "Let's go home"; and Chhuon then made

a U-turn. Sar heard gunshots and ducked. After hearing some gunshots from the driver's seat, Sar heard Pan say "something about pass him the gun," and Sar heard gunshots from the front passenger's seat. Sar testified that Chhuon or Pan said they thought the man they shot belonged to the 12th Street gang. Chhuon and Pan were "original gangster[s]" in the rival Tiny Rascals Gang (TRG).

A neighbor heard gunshots and saw a gun being held outside of the passenger's window of a brown Toyota car.

### c. Uncharged murder of Bunlort Bun[3]

On August 6, 1995 (two days before the Pomona crimes), Evans, Chhuon, Pan, and two others were in a brown Toyota Celica looking for someone to kill. They followed a car they believed belonged to a rival "Oriental Boys" gang member. Chhuon told Evans to shoot at the car and handed him a gun. Evans and Pan shot at the car. After the car stopped, Chhuon told Pan to confirm that the driver was dead; Pan approached the car and shot the driver three more times. The driver, Bunlort Bun, died from his gunshot wounds.

Thirty-two expended casings were found at the scene. Eighteen of them came from one gun, referred to as "Gun Number 1." Fourteen of them came from another gun, referred to as "Gun Number 2." On August 16, 1995, law enforcement officers saw Chhuon in a brown Toyota Celica in Sacramento, and found one spent nine-millimeter bullet casing and two live nine-millimeter bullets in it. The expended casings found in the car and at the Pomona crime scene had been fired from the same

---

[3] On February 29, 2000, Chhuon and Pan were convicted of the first degree murder of Bun in San Bernardino County.

gun, referred to as "Gun Number 1." The casings found at the Sacramento crime scene were fired from "Gun Number 2."

### 2. *Defense Evidence*

Regarding the Sacramento crimes, the defense cross-examined Vincent, Amie, and Luu regarding their descriptions and identifications of the suspects and presented testimony by law enforcement officers regarding inconsistencies in their descriptions and identifications. Regarding the Pomona crimes, the defense presented testimony by a law enforcement officer regarding Huerta's and the neighbor's earlier descriptions and identifications of the suspects. The defense also presented testimony by psychologist Robert Shomer regarding the accuracy of eyewitness identifications.

### B. Pan's Penalty Phase

#### 1. *Prosecution Evidence*

The court instructed the jury that Pan had been convicted of the uncharged first degree murder of Bun, but the allegation that Pan had personally used a firearm in that offense was found to be not true. The prosecution presented no additional evidence.

#### 2. *Defense Evidence*

Pan's father, Pita Pan, testified he had lived in Cambodia when the Khmer Rouge assumed power. His family escaped to a refugee camp in Thailand, where Pan was born. Life in the refugee camp was difficult, and Pan suffered a head injury there. A videotape regarding the Khmer Rouge was played.

In 1980, Pan's family moved to the United States. They were poor. Pan's mother had cancer, and he took care of her. In 1985, when Pan was around 10 years old, Pan and his mother

got into a car accident. He was hospitalized for "[m]any" months. His mother, with whom he had been close, died. His family did not tell him about her death for three months. After the car accident, Pan acted like a different person. On one occasion, he fell, hit his head, and began hallucinating and asking for his mother.

Pan's family members testified about his kindness. Pan's teacher, Terry Hale, testified that he was a wonderful young man, and she considered him as a son. Pan graduated from high school and attended junior college.

Psychologist Dr. Veronica Thomas opined that Pan's personality was consistent with antisocial personality disorder. Losing his mother and not being told about her death for several months negatively impacted him, and after the accident, his conduct became more disordered or asocial.

### C. Chhuon's Penalty Phase

#### 1. Prosecution Evidence

The court instructed the jury that Chhuon had previously been convicted of five first degree murders, but the allegation that he personally used a firearm in the commission of those murders was found to be not true. The court also instructed the jury that Chhuon had been convicted of the uncharged first degree murder of Bun.

#### a. Spokane murders

On July 10, 1995, Le Sang and Thi Hong Pham were found dead in their apartment with knife and gunshot wounds. Their four-year-old son identified Chhuon and Giao Ly as the perpetrators. Chhuon's fingerprint and Ly's palm print were found in the apartment.

Sar and Champa Onkhamdy testified that while visiting Spokane, Chhuon and Ly went out one night and returned with money and jewelry. The jewelry included an identification bracelet stolen from the four-year-old son.

### b. *Elm Street murders*[4]

On August 10, 1995, Karol, Evans, Chhuon, and Vinh Tran went to a house on Elm Street in San Bernardino to rob its occupants. Evans, Chhuon, and Vinh, who was armed, entered the house. The five occupants — Henry Nguyen, his wife Trinh Tran, their 15-year-old daughter Doan, their 11-year-old son Daniel, and their 10-year-old son David — died of gunshot wounds. When the perpetrators returned to the car, Karol saw that Chhuon had a gun. Casings from "Gun Number 1" and "Gun Number 2" were found at the scene.

### c. *Rape of D.T.*

Chhuon called 14-year-old D.T. into a room and told her to take off her pants. When she told him that she did not want to have sex with him, he put a knife to her neck and raped her.

### d. *San Bernardino jail incidents*

On May 6, 1996, Chhuon requested to be let out of his cell for "tier time." When San Bernardino County Sheriff Deputy Brice Jury denied the request, Chhuon became angry and kicked the door. The following morning, Chhuon yelled that he was going to kill Deputy Jury and his family. Chhuon also told San Bernardino County Sergeant Daniel Braun that he was going to kill Braun. When Deputy Jury later returned to Chhuon's cell,

---

[4]    In a separate trial, Chhuon was sentenced to death for these murders. On appeal, we affirmed his judgment. (*People v. Chhuon* (2021) 11 Cal.5th 1 (*Chhuon*).)

Chhuon held a shank and said he was going to kill him.  Chhuon poured water and shampoo on his cell floor.  When deputies subsequently entered his cell, Chhuon fought them and tried to bite Deputy Jury.  His cell contained a shank that was in the process of being made and an item that could be used to strangle someone.

### e.  Victim impact evidence

Amie testified that since the murders, her mother had been scared, and her sister's school performance had declined.  Avina's cousin testified about Avina's bright future and his family's grief.

## 2.  Defense Evidence

Chhuon was born in a village in Cambodia.  In 1975, when Chhuon was three years old, the Khmer Rouge assumed power in Cambodia, leading to impoverished and violent conditions.  A videotape regarding the Khmer Rouge was played, and several witnesses testified about life during this time.  Chhuon's father testified that he hid in a cave with Chhuon for over a week with no food or water, and Chhuon's father was later imprisoned and tortured by soldiers.  Chhuon's brother testified that the Khmer Rouge separated the children from their parents.  Chhuon and his brother were forced to bury those the soldiers had killed.  Chhuon and his siblings were hungry and malnourished and eventually escaped to a refugee camp in Thailand, where they found their mother.  Chhuon's mother testified about the conditions in the camp, which did not have electricity or running water.  Chhuon suffered from nightmares and headaches.

When Chhuon was around seven years old, his family moved to Alabama.  Life in Alabama was difficult due to racism and poverty.  When he was around 12 years old, his family later

moved to California. There, his mother developed an alcohol abuse problem, and Chhuon became involved in gangs. Chhuon subsequently had a son.

Psychiatrist Dr. Joseph Wu testified that Chhuon's PET scan results were indicative of posttraumatic stress disorder and hypofrontality, which can affect the ability to exercise good judgment and control impulses. Neuropsychologist Dr. Kyle Boone testified that additional tests indicated that Chhuon had frontal lobe dysfunction. Psychiatrist William Sack diagnosed Chhuon with posttraumatic stress disorder; reactive detachment disorder in childhood; conduct disorder and substance use in adolescence; and low-grade depression.

## II.   GUILT PHASE ISSUES

### A. Joinder of the Pomona and Sacramento Crimes

Chhuon and Pan claim that the trial court erred in permitting the Pomona and Sacramento crimes to be tried together, and this error violated their federal and state constitutional rights. We see no error.

### 1.  Joinder

The Sacramento and Pomona crimes occurred in 1995, and in 2000, the trial court permitted the prosecution to join the Pomona and Sacramento crimes pursuant to section 790.

Section 790, subdivision (b) (section 790(b)) provides that "[i]f a defendant is charged with a special circumstance pursuant to paragraph (3) of subdivision (a) of Section 190.2, the jurisdiction for any charged murder, and for any crimes properly joinable with that murder, shall be in any county that has jurisdiction pursuant to subdivision (a) for one or more of the murders charged in a single complaint or indictment as long as the charged murders are 'connected together in their

commission,' as that phrase is used in Section 954, and subject to a hearing in the jurisdiction where the prosecution is attempting to consolidate the charged murders." (§ 790(b).)

### a. Retroactivity

Pan argues that section 790(b) should not have been applied retroactively to the murders in this case because, enacted in 1998, section 790(b) could join only murders committed after 1998. Not so.

Section 790(b) addresses the conduct of trials. (Cf. *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299.) "[T]he ordinary rule of construction [is] that new statutes are intended to operate prospectively." (*Id.* at p. 287.) Nothing in its language or legislative history limits its applicability to trials based upon when the underlying murders occurred. (§ 790(b).) A law addressing "the conduct of trials . . . addresses conduct in the future," even if the law is "applied to the prosecution of a crime committed before the law's effective date." (*Tapia*, at p. 288.) Thus, when the prosecution sought to join the murders at trial in 2000, section 790(b) permitted joinder, even though the murders occurred before its effective date.

### b. Ex post facto

Chhuon and Pan also argue that applying section 790(b) to their trial involving 1995 crimes violated ex post facto principles and offended fundamental justice. Chhuon and Pan argue that applying section 790(b) in this case violated ex post facto principles because the murders occurred before section 790(b)'s enactment and joining the Sacramento and Pomona crimes increased their punishment by subjecting the Pomona murder to the multiple-murder special circumstance, making them eligible for the death penalty, and creating a

sufficient risk that they would be sentenced to death. We disagree.

To violate ex post facto principles, "[t]he statute must be retroactive, and must implicate at least one of the four categories described in *Calder v. Bull* (1798) 3 U.S. (3 Dall.) 386, 390 [1 L.Ed. 648]. [Citation.] To be considered retroactive, the law must ' "change[] the legal consequences of an act completed before [the law's] effective date," namely the defendant's criminal behavior.' [Citations.] 'In other words, the operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is criminal conduct committed before the disputed law took effect.' [Citation.] As to the second element, the four *Calder* categories encompass laws that (1) criminalize conduct that was innocent when done; (2) aggravate or make greater a crime than when committed; (3) change and increase the punishment; and (4) alter the rules of evidence to reduce the legal sufficiency necessary to support a finding of guilt." (*People v. Trujeque* (2015) 61 Cal.4th 227, 256.)

The United States Supreme Court has stated: "[W]e have never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the *Ex Post Facto* Clause. [Citation.] . . . [But] we have made it clear that mere speculation or conjecture that a change in law will retrospectively increase the punishment for a crime will not suffice to establish a violation of the *Ex Post Facto* Clause. [Citation.] The touchstone of this Court's inquiry is whether a given change in law presents a ' "sufficient risk of increasing the measure of punishment attached to the covered crimes." ' [Citation.] The question when a change in law creates such a risk is 'a matter of degree'; the test cannot be reduced to

a 'single formula.' " (*Peugh v. United States* (2013) 569 U.S. 530, 539.)

Section 790(b) addresses the jurisdiction for certain murders. (§ 790(b).) It applies only "[i]f a defendant is charged with a special circumstance pursuant to paragraph (3) of subdivision (a) of Section 190.2." (*Ibid.*) That special circumstance allegation — ("[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree") — if found true, makes the defendant subject to the death penalty or life imprisonment without the possibility of parole. (§ 190.2, subd. (a)(3).) In that circumstance, section 790(b) provides the jurisdiction for "any charged murder" and "any crimes properly joinable with that murder" shall be in any county that has jurisdiction for one or more of the murders, so long as the other requirements are met. (§ 790(b).)

Before section 790(b) was enacted, section 790 provided that jurisdiction for murder was in the county where the fatal injury was inflicted, the injured party died, or the injured party's body was found. (See § 790, subd. (a).) If a defendant committed multiple murders, the defendant might face charges for one murder in one county and then charges for another murder in another county. (Cf. *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1215 (*Alcala*) ["homicides committed by a serial killer in different counties . . . were required to be prosecuted successively in separate trials in different counties"].) In such successive prosecutions, the defendant might be charged with the special circumstance that "[t]he defendant was convicted previously of murder in the first or second degree," which would make the defendant subject to the

death penalty or life imprisonment without the possibility of parole. (§ 190.2, subd. (a)(2).)

Thus, a defendant who committed multiple murders was subject to a prior-murder special circumstance before section 790(b)'s enactment or a multiple-murder special circumstance after its enactment, and both make the defendant eligible for the death penalty. For this reason, we conclude that section 790(b), on its face, does not present a sufficient risk of increasing the punishment.

Nor did section 790(b), as applied here, present a sufficient risk of increasing the punishment for Chhuon and Pan. (See *In re Vicks* (2013) 56 Cal.4th 274, 312, 317 [considering facial and as-applied claims under ex post facto principles].) It is true that once the Pomona murder was joined with the Sacramento murders, the Pomona murder was included in the multiple-murder special circumstance. But if Chhuon and Pan were found guilty of the first degree murder of Avina (in Pomona), they already could be eligible for the death penalty based on the special circumstance allegation regarding their prior first degree murder convictions in San Bernardino. (See § 190.2, subd. (a)(2).) If they were found guilty of the first degree murders of Hung and Nghiep (in Sacramento), they could be eligible for the death penalty based on multiple-murder, burglary, attempted robbery, and prior-murder special circumstance allegations. (See § 190.2, subd. (a)(2), (3), (17).) Joining the Pomona and Sacramento murders therefore did not increase the range of possible punishment.

Chhuon asserts that the Special Circumstance Committee of the Los Angeles County District Attorney's Office did not decide to seek the death penalty in this case until after the

Sacramento and Pomona murders had been joined. But the prosecutor represented at the hearing regarding joinder that he expected the case would be a death penalty case, although that would not be decided until after the preliminary hearing. In these circumstances, we conclude that joining the murders did not present a sufficient risk of increasing the punishment.

Chhuon and Pan further argue that applying section 790(b) violated ex post facto principles because it altered the rules of evidence by changing the venue rules, eliminating the lack-of-venue defense, facilitating an easier conviction, permitting the jury to use evidence from one murder to convict them for the other murders, changing the prosecution's burden regarding the special circumstances, and changing the evidentiary landscape at the guilt and penalty phases. We disagree. Joining the Pomona and Sacramento murders did not alter the rules of evidence to reduce the legal sufficiency necessary to support a finding of guilt. In the guilt phase, the jury was instructed that "[e]ach Count charges a distinct crime" and it "must decide each Count separately." In the penalty phase, the jury considered the Pomona and Sacramento murders. (See § 190.3, subd. (a).) And had the Pomona and Sacramento murders not been joined, the jury likely would have still considered those murders. (See § 190.3, subds. (b) [directing the jury to consider violent criminal activity], (c) [prior felony convictions].) Nor did joining the murders violate ex post facto principles by relieving the prosecution of the burden of proving venue or deprive Chhuon and Pan of the lack-of-venue defense. (Cf. *People v. Delgado* (2010) 181 Cal.App.4th 839, 848 [rejecting similar argument].)

### c. Application of section 790(b)

Chhuon and Pan argue that even if section 790(b) could apply to this trial, joinder was improper under the terms of the statute. In particular, Chhuon and Pan assert the Sacramento and Pomona crimes were not connected together in their commission, as section 790(b) requires. We disagree.

Section 790(b) provides that murders may be joined together if, among other requirements, "the charged murders are 'connected together in their commission,' as that phrase is used in Section 954." (§ 790(b).) "In rejecting a requirement that one or more of the charged murders be cross-admissible, in favor of the 'connected together in their commission' language in section 790(b), the Legislature embraced a broad test that had been applied in numerous cases construing section 954." (*Alcala, supra,* 43 Cal.4th at p. 1217.) " ' "Offenses 'committed at different times and places against different victims are nevertheless "connected together in their commission" when they are . . . linked by a " 'common element of substantial importance.' " ' " ' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 686 (*Westerfield*).)

We have concluded that crimes were connected together in their commission based on a variety of common elements of substantial importance, including, for example: similar victims (see *Alcala, supra,* 43 Cal.4th at p. 1219); the same intent (see *People v. Scott* (2015) 61 Cal.4th 363, 395); the same motive (see *Alcala,* at p. 1219); and the same or similar weapon (see *People v. Armstrong* (2016) 1 Cal.5th 432, 455 ["same gun was used in both incidents"]; *People v. Landry* (2016) 2 Cal.5th 52, 76 (*Landry*) ["the use or possession by defendant of a prison-made stabbing weapon"; rejecting argument that "the common

element factor requires that the same weapon be involved in each crime"]; *People v. Balderas* (1985) 41 Cal.3d 144, 170). We also have concluded that crimes were connected together in their commission when, among other circumstances, they were committed within a close timeframe. (See *People v. Romero and Self* (2015) 62 Cal.4th 1, 29 [crimes "occurred within a two-month time period" and "involved a felonious intent to obtain property"]; *People v. Mendoza* (2000) 24 Cal.4th 130, 160 ["the close time frame within which the consolidated offenses were committed shows a continuing course of criminal conduct," and the " ' "element of intent to feloniously obtain property runs like a single thread through the various offenses" ' "]; see also *People v. Matson* (1974) 13 Cal.3d 35, 39 ["a mere 11 days and a mile and a half separated the two crimes"].) That said, crimes committed in a close timeframe are not necessarily, in all circumstances, connected together in their commission. (See *People v. Saldana* (1965) 233 Cal.App.2d 24, 30 [even though defendant possessed marijuana when he committed the rape, the crimes were "two wholly unrelated crimes"].) Nor are crimes necessarily connected together in their commission merely because some minor factual overlap exists between them. (See *People v. Renier* (1957) 148 Cal.App.2d 516, 520 [no common element based on the gun used in the robbery being found in the stolen vehicle].)

Here, we conclude that the Sacramento and Pomona crimes were connected together in their commission. Chhuon and Pan committed these crimes together and within 12 days. The gun used in Sacramento and the gun used in Pomona were both used in Bun's murder. Based on these facts, we conclude that the Sacramento and Pomona crimes were connected together in their commission, even though differences exist

between the crimes, including, among other things, that two different guns were used, respectively, in the Sacramento and Pomona crimes. (See *Landry, supra,* 2 Cal.5th at p. 76; *People v. Mendoza, supra,* 24 Cal.4th at p. 160.) Therefore, the trial court did not err in joining the crimes under section 790(b).

### d. *Vicinage*

Chhuon and Pan argue that joining the Pomona and Sacramento crimes violated their federal vicinage right. Pan asserts that joinder also violated his state vicinage right. We reject this claim.

"The Sixth Amendment to the United States Constitution guarantees criminal defendants the right to be tried 'by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law.' Article I, section 16 of the California Constitution (hereafter article I, section 16) has been construed as implicitly reserving a similar, but not necessarily coextensive, vicinage right." (*Price v. Superior Court* (2001) 25 Cal.4th 1046, 1050.)

"We have previously held that '[t]he vicinage clause of the Sixth Amendment has not been incorporated by the Fourteenth Amendment to apply in a state criminal trial.' " (*People v. Ng* (2022) 13 Cal.5th 448, 525 (*Ng*).) We therefore reject the claim that joinder violated their federal vicinage right.

" 'For vicinage rights under the state Constitution, "the vicinage right implied in article I, section 16 of the California Constitution . . . constitutes simply the right of an accused to a trial by an impartial jury drawn from a place bearing some reasonable relationship to the crime in question." ' " (*Ng, supra,* 13 Cal.5th at p. 525.) Section 790(b)'s requirement that the

murders be connected together in their commission satisfied their right to a trial by an impartial jury drawn from a place bearing some reasonable relationship to the murders. (Cf. *People v. Clark* (2016) 63 Cal.4th 552, 555 (*Clark*) [where venue was proper, "the place of trial did bear 'some reasonable relationship to the crime in question' and therefore satisfied the implied vicinage requirement" of the state Constitution].) No vicinage violation occurred, and we also reject Pan's argument that section 790(b) was unconstitutional.

### 2. Severance

Chhuon and Pan further argue that the trial court erred in denying the motion to sever the Sacramento crimes from the Pomona crimes. It did not.

"Because it ordinarily promotes efficiency, joinder 'is the course of action preferred by the law.' [Citation.] 'Nonetheless, a trial court has discretion to sever properly joined charges in the interest of justice and for good cause.' " (*Westerfield*, *supra*, 6 Cal.5th at p. 688.) "In determining whether a court abused its discretion in declining to sever properly joined charges, we first consider 'the cross-admissibility of the evidence in hypothetical separate trials.' [Citation.] If the evidence is cross-admissible, then this 'is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges.' [Citation.] If not, then we also consider '(1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the totality of the evidence may alter the outcome as to some or all of the charges; or (3) whether one of the charges (but not another) is a capital offense, or the joinder of the charges

19

converts the matter into a capital case.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 275–276 (*Gomez*).)

Here, even if we assume, without deciding, that evidence regarding the Pomona and Sacramento crimes would not have been admissible in separate trials, we nevertheless conclude that the trial court did not abuse its discretion in denying the motion for severance. (See *Gomez*, *supra*, 6 Cal.5th at p. 276.) None of the charges were unusually likely to inflame the jury against Chhuon and Pan. "[B]oth crimes were demonstrably cruel." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 747.) "[T]he incidents were 'different in their particulars,' but 'equally abhorrent.' " (*Ibid.*)

Nor was a weak case joined with a stronger case such that the spillover effect of aggregate evidence might alter the outcome of the charges. There was compelling witness testimony and ballistics evidence implicating Chhuon and Pan in both the Pomona and Sacramento crimes. Moreover, "[e]ven if the evidence in one case might be considered stronger than the other, '[a] mere imbalance in the evidence . . . will not indicate a risk of prejudicial "spillover effect," militating against the benefits of joinder and warranting severance of properly joined charges.' " (*People v. Thomas* (2012) 53 Cal.4th 771, 799.)

Finally, "[d]enials of severance involving capital charges generally require a 'higher degree of scrutiny and care.' [Citation.] Even greater scrutiny is required, we have said, when the joinder of separate murder charges gives rise to the special circumstance allegation of multiple murder. [Citation.] But nothing in our prior cases suggests that severance is required whenever capital charges are involved. [Citation.] Further, where one of two joined murder incidents would

20

independently give rise to a capital charge, there is less risk of prejudice." (*People v. Simon* (2016) 1 Cal.5th 98, 128 (*Simon*).)

Here, joining the Pomona and Sacramento crimes did not convert the case into a capital case because even absent joinder, Chhuon and Pan faced a prior-murder special circumstance allegation. (Cf. *Simon*, *supra*, 1 Cal.5th at p. 129.) Multiple murder, burglary-murder, and robbery-murder special circumstances apply to the Sacramento crimes as well. "Furthermore, there was strong evidence supporting each incident. So neither case posed an undue risk of unjustified conviction. [Citations.] Because joinder did not bolster the possibility of conviction, joinder also did not bolster the possibility of the death penalty being imposed as punishment." (*Ibid*.) We thus conclude that the trial court did not abuse its discretion in denying the motion for severance.

" '[E]ven if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that "the joint trial resulted in such gross unfairness as to amount to a due process violation." ' " (*Gomez*, *supra*, 6 Cal.5th at p. 276.) "In determining whether joinder resulted in gross unfairness, we have observed that a judgment will be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Simon*, *supra*, 1 Cal.5th at pp. 129–130.)

Pan argues that joinder denied him a fair trial because the prosecutor used evidence regarding the Pomona murder to convince the jury that he was guilty of the Sacramento murders. Not so. The court instructed the jury that "[e]ach Count charges a distinct crime" and it "must decide each Count separately."

"[T]he record does not suggest that the jury was unable to decide each count separately as it was specifically instructed to do." (*Gomez, supra,* 6 Cal.5th at p. 277; cf. *Silveria, supra,* 10 Cal.5th at pp. 244–245.) Reviewing all the circumstances, we do not conclude that joinder actually resulted in gross unfairness. Nor did trying these charges together violate the right to be tried by an unbiased jury.

### B. Claims Regarding Pan's Counsel

Pan claims that defense counsel conceded Pan's guilt in closing argument, against his express wishes and in violation of his state and federal constitutional rights to a fundamentally fair trial, effective assistance of counsel, due process, to have a jury determine his guilt or innocence, and to decide that the objective of his defense is to maintain his innocence. We conclude that defense counsel violated Pan's right to decide the objective of his defense and that based on this structural error, we must reverse his judgment.

#### 1. Background

In the guilt phase closing argument, defense counsel began: "One of the things you should know, that the role of the defense attorney is here to thank you and to defend the damned. The damned, because obviously I am not going to insult your intelligence by telling you that my guy or my client was not involved or did not know of or was not at the scene of these events." While Chhuon was "clearly the gun wield[]er in Sacramento, clearly the driver in Pomona, clearly the driver in the Bun case in San Bernardino," "Mr. Pan happened to be there. He happened to be there in all events. And whatever choice he made, he was there. [¶] I am not going to insult your intelligence by telling you that he is not culpable in some of the

actions and in making pretty bad decisions in his life, particularly in the summer of 1995."

Defense counsel then made a series of arguments, including to attack the reliability of the identifications and accomplice testimony. Among other arguments, he asserted as to the Pomona crimes, that "there was no possibility that the bullet that killed Mr. Avina came from my client's car, it came from the right side from two other people," and "there is a reasonable doubt whether the gun or whether Mr. Pan himself was the gentleman who killed Mr. Avina or wanted to kill Mr. Avina." Defense counsel asserted as to the Sacramento crimes, "I will be candid with you. Again, I will not say that Mr. Pan was not there. He was there. [¶] I am not going to say that he wasn't hanging out in San Bernardino [*sic*] and trying to maybe rob people. . . . But on the night of July the 27th he clearly was not an aider and [abettor]. [¶] He clearly was not there to kill. And he clearly made the decision not to rob." "[H]e shows his bravado by going along. But when it really comes to it, he's backing out. He's back there. He's there but does nothing more. [¶] The jury instruction is very specific on the top of page twelve. [¶] Mere presence at the scene of the crime which does not in itself assist the commission of the crime does not amount to aiding and abetting. [¶] Mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting. [¶] Mere presence, which does not in itself assist the commission of the crime. [¶] What did [Pan] do to assist that murder in Sacramento? [¶] Zero."

Defense counsel concluded, "Why were you never told about the [B]lack people shooting in Pomona? [¶] Why were you never told in the Sacramento case that he had made several different identifications and made no identifications before?

[¶] Why did we, as the advocates for your liberty, have to bring that to you? That in itself challenges the integrity of the case against my client by the district attorney's office as well as makes it questionable as to whether he's really proven that my client wanted to kill in Sacramento, wanted to kill in Pomona. [¶] You may find him guilty but not of first degree murder. I would submit to you that taking everything — and these are horrible crimes. I am not excusing my client. But the most that you can have is he was not an aider and abettor or if he even was, there was no malice that he harbored and did not know of as an aider and abettor should know of, of the malice aforethought, and the intent to kill that harbored Mr. Chh[uo]n. [¶] My client is guilty, if anything, of second degree murder. And I ask to you [*sic*] return that verdict. [¶] Thank you very much."

In rebuttal argument, the prosecutor emphasized that defense counsel "admits to you that his client is guilty of second degree murder. He admits that his client was present at the scene in each murder described." "[Defense counsel] wants to confuse you. He's hoping you'll return verdicts of second degree because you'll go back and say, wait a second, [defense counsel] told us his client was guilty. He wouldn't tell us that if it really wasn't the case and it is only second degree murder. [¶] Don't buy that, ladies and gentlemen. [¶] If he is an aider and abettor, and he is guilty, he is guilty of first degree murder. Simple as can be. He is either part of that robbery or not a part of it. [¶] [Defense counsel] admits that he is a part of it." The prosecutor repeated, "And the evidence in this case is overwhelming, so overwhelming that [defense counsel] has admitted his client is guilty. But he is hoping that he can

somehow convince you don't return a verdict of first degree murder even though that is what the evidence clearly shows."

The following day, Pan wrote to the court: "I specifically instructed my lawyer not to claim any guilt on my behalf which he failed to do so during closing argument; which I was tempted to cause a scene once I heard him claim something I instructed him not to do; but I restrained myself out of respect for the court and Your Honor and just decided to approach this issue as I am now."

The trial court then conferred with Pan and his counsel, during which his counsel explained his choices concerning the closing argument: "[T]his is a strategic move on my behalf. . . . If [Pan]'s convicted of first degree murder and a second degree murder, he will have to face that special circumstance, and I am concerned about that. . . . I believe the evidence was overwhelming against Mr. Pan. . . . For these reasons, I believe that I needed to keep my credibility with the jury. . . . I think if I went to the jury and specifically indicated not guilty, that he's not guilty of any of this and they should throw it all out, I think I would have no credibility to argue for his life. I believe that I had to give up something, and that is give up the second degree murder and second degree on all three of the murder charges for Mr. Pan, because then he would not face the death penalty. [¶] And that[] was my strategy." "Pan was aware I was going to do that. In fact, before my argument, we had a long discussion of that here at counsel table. He was very upset about that. . . . I have noted in [my notebook] that Mr. Pan was very upset at me, that it was a strategic move for me to argue for second degree murder in order that at least we do not face the penalty, and hopefully, it will come back with three second degree murders. . . . I know that Mr. Pan did not want me to argue

25

that, and I was aware that he was very upset with me yesterday, and he has reason to be. . . . I did argue to the jury specifically the specific jury instructions . . . and I told Mr. Pan to read those specific things; said why didn't you argue that I had no involvement? Not only did I argue you had no involvement, I specifically read the jury instructions . . . regarding mere presence at the scene of the crime . . . ."

### 2. Discussion

Relying on the high court's recent decision in *McCoy*, *supra*, 584 U.S. 414, Pan argues that defense counsel's strategy deprived Pan of his right to decide the objective of his defense. We agree.

In *McCoy*, defense counsel "concluded that the evidence against [the defendant] was overwhelming and that, absent a concession at the guilt stage that [the defendant] was the killer, a death sentence would be impossible to avoid at the penalty phase." (*McCoy*, *supra*, 584 U.S. at p. 418.) When defense counsel informed the defendant, the defendant was furious, insisted that he did not engage in the charged acts, and objected to any admissions of guilt. (*Id.* at pp. 417, 418.) Nevertheless, defense counsel told the jury that the defendant committed the murders and was guilty of second degree murder. (*Id.* at p. 420; see *id.* at p. 427 (dis. opn. of Alito, J.).)

The high court held that defense counsel violated the defendant's rights under the Sixth Amendment. (*McCoy*, *supra*, 584 U.S. at pp. 426–427.) The high court explained that "[t]rial management is the lawyer's province: Counsel provides his or her assistance by making decisions such as 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.'

[Citation.] Some decisions, however, are reserved for the client — notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Id.* at p. 422.) "Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. Just as a defendant may steadfastly refuse to plead guilty in the face of overwhelming evidence against her, or reject the assistance of legal counsel despite the defendant's own inexperience and lack of professional qualifications, so may she insist on maintaining her innocence at the guilt phase of a capital trial. These are not strategic choices about how best to *achieve* a client's objectives; they are choices about what the client's objectives in fact *are*." (*Ibid.*) Thus, the high court reasoned that when "[p]resented with express statements of the client's will to maintain innocence . . . counsel may not steer the ship the other way." (*Id.* at p. 424.) "With individual liberty — and, in capital cases, life — at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*Id.* at pp. 417–418.) Further, such a violation is " 'structural' " and "not subject to harmless-error review." (*Id.* at p. 427.)

In *People v. Bloom* (2022) 12 Cal.5th 1008, 1042 (*Bloom*), we reversed two murder convictions and the associated death judgment based on *McCoy*, *supra*, 584 U.S. 414. There, defense counsel conceded the defendant's responsibility for the deaths of three victims in an effort to pursue a mental capacity defense to the murder charges, even though the defendant was only willing to accept responsibility for killing one victim and expressly objected to admitting responsibility for the other two victims.

(*Bloom*, at p. 1015.)  We concluded that counsel's decision to concede the defendant's guilt as to the other two victims "cannot be squared with a rule that gives the criminal defendant the right to 'oppos[e] . . . any admission of guilt' [citation] and instead 'pursue acquittal' as the object of the representation." (*Id.* at p. 1038.)  "[T]he decision whether to concede the defendant should be found guilty of a crime — even a lesser crime than the one the prosecution charged — is a decision that necessarily belongs to the defendant."  (*Id.* at p. 1039.)  This violation required us to reverse the judgment concerning the affected counts and associated allegations without any showing of prejudice.  (*Id.* at p. 1042.)

We encounter similar circumstances in this case.  Like the defense counsel in *McCoy*, *supra*, 584 U.S. at p. 418, defense counsel concluded that the evidence against Pan was overwhelming and unless he conceded that Pan was guilty of second degree murder, defense counsel would have no credibility to argue to spare Pan's life in the penalty phase.  When defense counsel informed Pan, Pan was upset and made clear that he did not want counsel to argue for second degree murder. Nevertheless, defense counsel made the strategic choice to concede Pan's guilt of second degree murder in an effort to avoid the death penalty.

The Attorney General, however, argues that unlike the circumstances in *McCoy*, *supra*, 584 U.S. 414, defense counsel "complied with his client's insistence that he argue for innocence as to each of the charged murders"; "he offered the concession of second-degree murder as an alternative argument for the jurors to consider *only if* they rejected his primary argument"; and "[c]ounsel's only unqualified admission was to his client's presence at the murder scenes."  In other words, "counsel did not

confess appellant Pan's guilt, but argued in the alternative that even if the prosecution proved that appellant Pan was an aider and abettor, it only established second-degree murder." This, the Attorney General argues, did not implicate *McCoy* because *McCoy*'s "holding applies to unqualified admissions of guilt" and does not apply to "conditional, alternative concessions."

We agree that defense counsel's argument was at times unclear. Defense counsel made what appeared to be somewhat conflicting, or alternative, arguments. For example, defense counsel attacked the reliability of the identifications yet conceded that Pan was present at the crime scenes. Defense counsel also used conditional language at some points, while omitting such language at other points.

Considering defense counsel's argument in full, however, we conclude that despite Pan's express wish to maintain his innocence, defense counsel conceded Pan's guilt. Defense counsel argued, "I am not going to insult your intelligence by telling you that my guy or my client was not involved or did not know of or was not at the scene of these events"; he "happened to be there in all events"; "I am not going to insult your intelligence by telling you that he is not culpable in some of the actions and in making pretty bad decisions in his life, particularly in the summer of 1995"; and "[y]ou may find him guilty but not of first degree murder." Most crucially, defense counsel also ended his closing argument by telling the jury, "My client is guilty, if anything, of second degree murder. And I ask to you [*sic*] return that verdict."

Moreover, at trial, Pan and defense counsel understood defense counsel to have conceded Pan's guilt. Pan believed defense counsel claimed guilt on his behalf and did so despite Pan's specific request not to. Defense counsel admitted, "I think

if I went to the jury and specifically indicated not guilty, that he's not guilty of any of this and they should throw it all out, I think I would have no credibility to argue for his life. I believe that I had to give up something, and that is give up the second degree murder and second degree on all three of the murder charges for Mr. Pan, because then he would not face the death penalty. [¶] And that[] was my strategy." And defense counsel knew that "Pan did not want [him] to argue that."

While our focus remains on what defense counsel actually argued to the jury, the fact that Pan and defense counsel understood defense counsel to have conceded Pan's guilt underscores the reasonable likelihood that the jury interpreted defense counsel to have conceded Pan's guilt to all the charged crimes. In addition, the prosecutor, too, believed — and, more importantly, *argued to the jury* — that defense counsel had conceded Pan's guilt of second degree murder. The prosecutor argued to the jury that defense counsel "admits to you that his client is guilty of second degree murder"; that "the evidence in this case is overwhelming, so overwhelming that [defense counsel] has admitted his client is guilty"; and that defense counsel "[is] hoping you'll return verdicts of second degree." And at no point during the prosecutor's rebuttal argument did defense counsel object that the prosecutor mischaracterized his concession. Moreover, defense counsel made his statements in the context of ending closing argument by telling the jury, "My client is guilty, if anything, of second degree murder. And I ask to you [*sic*] return that verdict." In this way, defense counsel ended closing arguments by expressly asking the jury to return a verdict of second degree murder. This was not a limited, conditional concession. When considered in full in light of the multiple different concessions and in the context of Pan's,

defense counsel's, and the prosecutor's understanding of what was conceded, a *McCoy* error occurred for all the charges.

"[T]he decision whether to concede the defendant should be found guilty of a crime — even a lesser crime than the one the prosecution charged — is a decision that necessarily belongs to the defendant." (*Bloom*, *supra*, 12 Cal.5th at p. 1039.) On this record, we conclude that having heard Pan's express wish to maintain his innocence, defense counsel in closing argument deprived Pan of his "right to 'oppos[e] . . . any admission of guilt' [citation] and instead 'pursue acquittal' as the object of the representation." (*Bloom*, at p. 1038.) To be sure, "[c]ounsel may reasonably assess a concession of guilt as best suited to avoiding the death penalty . . . . But the client may not share that objective." (*McCoy*, *supra*, 584 U.S. at p. 422.) "When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." (*Id.* at p. 423.) We conclude that defense counsel here failed to do so and thereby deprived Pan of his right to choose the fundamental objective of his defense. (See *id.* at p. 426.)

This "is error of the sort that, as *McCoy* instructs, defies harmlessness review." (*Bloom*, *supra*, 12 Cal.5th at p. 1042.) As the high court has explained, "counsel's admission of a client's guilt over the client's express objection is error structural in kind. [Citation.] Such an admission blocks the defendant's right to make the fundamental choices about his own defense. And the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." (*McCoy*, *supra*, 584 U.S. at pp. 427–428.) We acknowledge that *McCoy* error only "requires reversal of the affected counts and associated allegations." (*Bloom, supra*,

12 Cal.5th at p. 1041.)  In this case, although defense counsel made concessions regarding the murders without expressly addressing the remaining charges (i.e., the two attempted murder charges relating to the shooting of Luu and Huerta, the first degree burglary or attempted robbery in Sacramento, or the various allegations regarding firearm use and actions undertaken to benefit a gang), defense counsel's concessions affected the jury's consideration of all the charged crimes in Sacramento and Pomona.  For instance, it would have been difficult, if not impossible, for the jury to have accepted that Pan was guilty of second degree murder for the fatal shooting of Nghiep Thich Le, Hung Dieu Le, and Avina — as defense counsel conceded — but that he was not guilty of the nonfatal shooting of Luu and Huerta, which occurred simultaneous to the killing of the murder victims.  Likewise, a concession on the murders necessarily concedes the firearm use allegations, as there was no dispute that the homicide victims were shot and killed.  For these reasons, we reach the same conclusion regarding the remaining charges (first degree burglary and attempted robbery) and true findings (actions undertaken to benefit a gang).  Thus, we find that on this record, we must reverse all of Pan's convictions.  (Cf. *McCoy*, *supra*, 584 U.S. at p. 428; see *Bloom*, at p. 1041 ["*McCoy* error requires reversal of the affected counts and associated allegations"].)[5]

---

[5]     These circumstances differ from those in *Bloom*.  In *Bloom*, we reversed the convictions, as well as associated allegations, for two murders because counsel conceded the defendant killed those two victims, despite defendant's insistence to the contrary; however, we did not reverse the conviction for a third murder because the defendant

## C. Claims Regarding Admitted Evidence

### 1. *Bun's Murder*

Chhuon and Pan claim that the trial court erred in admitting evidence of Bun's murder and thereby violated their state and federal constitutional rights to due process, a fundamentally fair trial, and reliable determinations of guilt and penalty. They further claim that the court erred in instructing the jury that this evidence may be considered to show identity or a common scheme for the Sacramento crimes. We conclude that the trial court did not err in admitting this evidence, and if the court erred in instructing the jury regarding it, any such error was harmless.

The prosecutor successfully moved over objection to introduce evidence regarding Bun's murder to show identity, common scheme, and motive as to the Pomona crimes. The court instructed the jury on the limited use of such evidence, including that it may not be considered to prove that Chhuon or Pan are persons "of bad character" or with "a disposition to commit crimes."

"Evidence Code section 1101, subdivision (a) generally prohibits the admission of evidence of a prior criminal act against a criminal defendant 'when offered to prove his or her conduct on a specified occasion.' Subdivision (b) of that section, however, provides that such evidence is admissible when

---

"acknowledged that he shot [that victim] to death and clearly told the court and counsel that he had no objection to saying so." (*Bloom, supra*, 12 Cal.5th at p. 1041.) By contrast, here, Pan was not willing to acknowledge that he killed any of the victims and rather instructed his lawyer not to claim "any" guilt on his behalf.

relevant to prove some fact in issue, such as motive, intent, knowledge, identity, or the existence of a common design or plan." (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.) In addition, "[e]vidence may be excluded under Evidence Code section 352 if its probative value is 'substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' [Citation.] 'Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value.' " (*Id.* at pp. 22–23.) "We review a trial court's decision to admit evidence under Evidence Code sections 1101 and 352 for abuse of discretion." (*People v. Thomas* (2023) 14 Cal.5th 327, 358.)

" ' "In cases in which the prosecution seeks to prove the defendant's identity as the perpetrator of the charged offense by evidence he had committed uncharged offenses, admissibility 'depends upon proof that the charged and uncharged offenses share distinctive common marks sufficient to raise an inference of identity.' " ' " (*People v. Cage* (2015) 62 Cal.4th 256, 273 (*Cage*).) " ' "[T]he uncharged crimes must be highly similar to the charged offenses." [Citation.] The similarity, considering the degree of similarity and the number of common marks, should amount to a signature.' " (*People v. Rogers* (2006) 39 Cal.4th 826, 852 (*Rogers*).)

We conclude that the trial court did not abuse its discretion in admitting evidence regarding Bun's murder as relevant to prove Chhuon's and Pan's identity as the perpetrators of the Pomona crimes. The circumstances surrounding the murders were very similar. On August 6, Chhuon left Karol's house and drove a brown Toyota Celica with Pan in the front passenger seat and three others in the car; they

spotted a car that they believed belonged to another rival gang member; and Pan and Evans shot and killed the suspected gang member, Bun. Two days later, Chhuon left Karol's house and drove a brown Toyota Celica with Pan in the front passenger seat and two others in the car; they saw a Hispanic man and thought he belonged to another rival gang; and Chhuon and Pan shot and killed the suspected gang member, Avina. Eighteen of the casings found at the Bun crime scene came from the same gun used in the Pomona crimes. Even though — as Chhuon and Pan detail — differences exist between Bun's and Avina's murders, we see no abuse of discretion in admitting evidence of the uncharged Bun murder here to show identity. (See *People v. Medina* (1995) 11 Cal.4th 694, 748 [common features included the use of the same car and gun within two-and-one-half weeks]; see also *Rogers*, *supra*, 39 Cal.4th at p. 852.)

"A somewhat lesser degree of similarity is required to show a common plan or scheme . . . ." (*Cage*, *supra*, 62 Cal.4th at pp. 273–274.) "[I]n establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) Here, evidence that Chhuon and Pan committed Bun's murder in a markedly similar manner to Avina's murder was relevant to demonstrate that Chhuon and Pan killed Avina in the manner alleged by the prosecution. (*Id.* at p. 394, fn. 2; see *Chhuon, supra*, 11 Cal.5th at pp. 28–29 [common design where, among other things, defendant accompanied fellow gang members, carried a nine-millimeter pistol, and targeted Asian families]; *People v. Garnica* (1981)

121 Cal.App.3d 727, 735 [common plan where, among other things, both involved the same hit man and were committed for the purpose of killing a gang enemy]; cf. *People v. Vargas* (2020) 9 Cal.5th 793, 819.) Thus, we conclude that the trial court did not abuse its discretion in admitting Bun's murder as relevant to prove a common scheme as to the Pomona crimes.

Evidence is admissible to shed light on defendant's motive and intent "if there is 'sufficient evidence for the jury to find defendant committed both sets of acts, and sufficient similarities to demonstrate that in each instance the perpetrator acted with the same intent or motive.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 827.) Here, the court did not abuse its discretion in admitting Bun's murder to prove Chhuon's and Pan's intent and motive in Avina's murder. (See *Chhuon, supra*, 11 Cal.5th at pp. 26–27 [intent to kill]; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1212 [prior drive-by shooting for gang purposes "helped show that [defendant] likely committed the instant drive-by shooting for gang-related purposes"].)

Having concluded that the trial court did not abuse its discretion under section 1101, we next consider whether the court acted within its discretion under Evidence Code section 352. Chhuon and Pan argue that Bun's murder had little or no probative value as to the Pomona crimes, much less to the Sacramento crimes, and Bun's murder was unduly prejudicial and risked confusing the issues and misleading the jury in part because the evidence suggested Chhuon and Pan went looking for someone to kill and Pan shot Bun at a close distance. We disagree. As discussed, Bun's murder was relevant to support multiple facts at issue in Avina's murder. The circumstances of Bun's murder were not more inflammatory

than those of Avina's murder. And the court instructed the jury that such evidence may not be considered to prove that Chhuon or Pan are persons of "bad character" or with "a disposition to commit crimes." (See *Chhuon*, *supra*, 11 Cal.5th at p. 30.) We thus conclude that the trial court acted within its discretion under section 352. (See *People v. Thomas*, *supra*, 14 Cal.5th at p. 350.)

In addition to challenging the admission of the evidence of Bun's murder, Chhuon also argues that the trial court erred in instructing the jury to consider other crimes evidence if it tends to show a common scheme which would further tend to show the identity of the person who committed the charged crimes because the other crimes evidence was not admissible as to identity and evidence of a common plan cannot prove identity. As discussed above, contrary to Chhuon's argument, evidence regarding Bun's murder was relevant to prove Chhuon's and Pan's identity as the perpetrators of the Pomona crimes. In any event, Chhuon fails to show that it is reasonably probable that a more favorable result would have been obtained absent any asserted instructional error here because, as discussed above, evidence regarding Bun's murder was relevant to prove both a common scheme and identity as to the Pomona crimes. (See *People v. Thomas*, *supra*, 14 Cal.5th at p. 347, fn. 15 [applying *People v. Watson* (1956) 46 Cal.2d 818].)

Chhuon and Pan further argue that the trial court erred in failing to limit evidence regarding Bun's murder to the Pomona crimes, as opposed to the Sacramento crimes. While the court instructed the jury that the other crimes evidence may be considered to show intent and motive for Avina's murder, the court also instructed the jury that the other crimes evidence may be considered to show the identity of the person "who

committed the crimes, if any, of which the defendant is accused" and a common scheme which would tend to show the identity of the person who committed "a crime, if any, of which the defendant is accused."

We need not decide whether an error occurred because any such error was harmless. Here, the trial court properly admitted Bun's murder for the other purposes discussed. (See *People v. Thomas*, *supra*, 14 Cal.5th at p. 347, fn. 15; *People v. Davis* (2009) 46 Cal.4th 539, 603.) And there was significant evidence showing that Chhuon and Pan were the perpetrators of the Sacramento crimes: Chhinkhathork and Evans testified about how they, along with Chhuon and Pan, planned to rob the Le family apartment; Amie and Luu identified Chhuon; and Vincent identified Chhuon and Pan. (See *Davis*, at p. 603.) In these circumstances, it is not reasonably probable that the outcome would have been different absent any error. (See *Thomas*, at p. 347, fn. 15; *People v. Jones* (2012) 54 Cal.4th 1, 53.)

Finally, we reject Chhuon's and Pan's claim that the trial court's asserted errors with respect to Bun's murder violated their constitutional rights to due process, a fundamentally fair trial, and reliable determinations of guilt and penalty. (See *People v. Thomas*, *supra*, 14 Cal.5th at p. 368 ["Because there was no statutory error [under Evidence Code sections 1101, subdivision (b) or 352], defendant's constitutional claims likewise fail"]; *People v. Jones*, *supra*, 54 Cal.4th at p. 54 [rejecting claim that asserted instructional error regarding other crimes evidence violated constitutional rights].)

## 2. *Chhuon's Statements*

Chhuon claims that the trial court erred in admitting his videotaped statements to Detective Marci Minter and thereby violated his rights to counsel, due process, and a fair penalty determination. We conclude any error was harmless beyond a reasonable doubt.

On September 7, 1995, two law enforcement officers from Washington State visited Chhuon while he was in custody in Sacramento. After Chhuon signed a form waiving his rights to counsel and to remain silent in regard to the Spokane offenses, the officers questioned him for over an hour regarding the Spokane offenses and then left the room. A few minutes later, a woman (Detective Minter) entered the room; introduced herself as "Marci" and "the examiner for the truth detection, truth verification"; and explained the process surrounding a truth-verification test, which she described as a test that he can pass so long as he told the truth. She then also questioned him about the Spokane offenses. In the course of her questioning, Chhuon made several statements regarding the Sacramento offenses: he said that he was planning to rob the Sacramento apartment because he believed that it contained 40 or 50 thousand dollars, but somebody else got to the apartment before he did and killed its occupants. These statements were played for the jury.

"The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense.' [Citations.] This constitutional protection 'guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a "medium" between him and the State.' " (*People v. Fayed* (2020)

9 Cal.5th 147, 161 (*Fayed*).) "Under *Massiah* when, after adversarial judicial criminal proceedings have been initiated and in the unwaived absence of counsel, a government agent deliberately elicits from a defendant incriminating statements, those statements are inadmissible at a trial on the charges to which the statements pertain. [Citations.] Such a Sixth Amendment violation occurs when the government intentionally creates or knowingly exploits a situation likely to induce the defendant to make incriminating statements without the assistance of counsel, but not when the government obtains such statements through happenstance or luck." (*People v. Dement* (2011) 53 Cal.4th 1, 33; *Massiah v. United States* (1964) 377 U.S. 201.)

Here, the parties do not dispute that at the time of the exchange, Chhuon was represented by counsel for the Sacramento offenses and Detective Minter worked for the Sacramento County Sheriff's Office. Over objection, however, the trial court ruled that Chhuon's statements to Detective Minter regarding the Sacramento offenses were admissible because they "were in the nature of blurt-out statements" and even though "[Detective Minter] did ask a couple of questions for clarification of the Sacramento matter . . . they were just for clarification of what he had said to her."

We need not decide whether the trial court erred because any error was harmless beyond a reasonable doubt as to both the guilt and penalty phase. (*Chapman v. California* (1967) 386 U.S. 18.) Significant evidence established Chhuon's involvement in the Sacramento offenses. Nevertheless, Chhuon argues that his statements to Detective Minter were prejudicial because the prosecutor relied on them, and they undermined Chhuon's credibility and "his defense that he was not the

shooter." But multiple witnesses testified that Chhuon had the gun and entered the apartment: Amie testified that Chhuon had the gun; Evans testified that only Chhuon entered the apartment; and Luu testified that Chhuon shot her, her husband, and her father-in-law. Hence even if Chhuon's statements to Detective Minter were improperly admitted, we conclude that any error was harmless beyond a reasonable doubt.

### 3. Unavailability of Witness

Chhuon and Pan claim that the trial court erred in permitting the prosecution to introduce Huerta's preliminary hearing testimony after deeming him unavailable at trial. This error, they claim, violated state law and their state and federal constitutional rights to confront witnesses, due process, and reliable guilt and penalty phase determinations. We conclude that the court did not err in admitting Huerta's former testimony.

"The confrontation clauses of the state and federal Constitutions guarantee defendants the right to confront the witnesses against them. [Citations.] . . . [¶] Although the constitutional right of confrontation is important, it is not absolute. [Citation.] If a witness is unavailable but had previously testified against the defendant and was subject to cross-examination at that time, that prior testimony may be admitted. [Citations.] Evidence Code section 1291 codifies this exception to the confrontation clauses, stating, 'Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] . . . [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was

given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' [Citation.] We have held this exception permits an unavailable witness's preliminary hearing testimony to be admitted at trial." (*People v. Wilson* (2021) 11 Cal.5th 259, 289–290 (*Wilson*).)

"The prosecution must demonstrate that 'the witness is unavailable and, additionally, that it made a "good-faith effort" [citation] or, equivalently, exercised reasonable or due diligence to obtain the witness's presence at trial.' [Citation.] While due diligence lacks a precise definition, we have explained that it ' " 'connotes persevering application, untiring efforts in good earnest, [and] efforts of a substantial character.' " ' [Citation.] We evaluate whether the prosecution timely searched for the unavailable witness, whether the prosecution 'competently explored' leads on the witness's location, and the overall import of the unavailable witness's testimony. [Citation.] We review de novo the trial court's unavailability determination, although we defer to the trial court's determination of historical facts supported by substantial evidence." (*Wilson*, *supra*, 11 Cal.5th at p. 291.)

*Huerta*

Huerta had previously testified at the November 2000 preliminary hearing. On August 21, 2001, he confirmed with the prosecutor's investigator that he would keep in touch and let him know if he left his employment or the country. On December 10, 2001, the investigator contacted Huerta's employer and learned that Huerta had left for Mexico around December 4 but was expected to return in one month. The investigator repeatedly contacted Huerta's employer over the

following month.  The investigator also asked Huerta's employer if it had any contact numbers for Huerta in Mexico; the employer did not.  In addition, the investigator asked the local sheriff's department to visit Huerta's residence "to see if he was at the location or if anybody at the location knew how we could get a hold of [him]"; the sheriff reported that Huerta no longer lived there.  The investigator checked at the DMV for vehicles registered to Huerta and placed "an inbound check" with the United States Customs Office for Huerta's vehicle, so the investigator would be contacted if Huerta's vehicle entered this country.  The investigator also reached out to the local probation department; the probation officer reported that Huerta had completed his probation and did not know Huerta's location other than addresses that the investigator already had.

Chhuon and Pan argue that the prosecution failed to undertake timely efforts to locate Huerta.  In their view, the investigator should have contacted Huerta between August 21 and December 10 and should not have "passively" waited for Huerta to return after December 10.  But "[t]he prosecution is not required 'to keep "periodic tabs" on every material witness in a criminal case . . . .'  [Citation.]  Also, the prosecution is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing."  (*People v. Wilson* (2005) 36 Cal.4th 309, 342.)  As the trial court found, "Huerta was in contact or was available to be contacted, and then suddenly disappeared on the People."  In these circumstances, the prosecution did not fail to undertake timely efforts to locate Huerta.  (See *ibid*.)

Chhuon and Pan further argue that the prosecution failed to undertake sufficient efforts to locate Huerta, particularly

43

given that he was an important witness in a capital trial. They note, for example, that the investigator did not personally visit Huerta's workplace or residence; did not check the post office for a forwarding address; did not check whether Huerta was in any jail or hospital; did not inquire into his legal status in the United States; and did not contact others such as his family, friends, coworkers, prior employers, or neighbors. Nor did the investigator obtain Huerta's contact information in Mexico, request assistance from the government or authorities in Mexico, attempt to subpoena him in Mexico, or use a treaty between Mexico and the United States providing for cooperation in the prosecution of crimes.

"The prosecution must do what is reasonable under the circumstances, not necessarily everything that can be suggested in hindsight." (*People v. Sánchez* (2016) 63 Cal.4th 411, 442 (*Sánchez*).) We have concluded that the prosecution exercised due diligence even if the prosecution could have undertaken additional efforts. (See, e.g., *People v. Wilson, supra,* 36 Cal.4th at pp. 341–342 [prosecution exercised due diligence even though the detective did not check with the post office for a forwarding address, locate family, or contact prison visitors].) We further have concluded that the prosecution can exercise due diligence even if the prosecution failed to make use of the treaty between Mexico and the United States. (*Sánchez*, at pp. 441–442.) While the prosecution here could have undertaken additional efforts to locate Huerta, we conclude that "[w]hat the prosecution did here contrasts with cases where courts have found deficiencies — cases where review did not reveal 'adequate diligence, [and where] the efforts of the prosecutor or defense counsel have been perfunctory or obviously negligent.' [Citation.] In contrast, 'diligence has been found when the prosecution's efforts are

timely, reasonably extensive and carried out over a reasonable period.' " (*Wilson, supra,* 11 Cal.5th at pp. 292–293.) The efforts here spanned a month and included multiple avenues of inquiry. (See *id.* at p. 293.) " ' " 'That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness.' " ' " (*Sánchez,* at p. 448.)

Lastly, Chhuon and Pan argue that Huerta was not unavailable "as that term was understood by the Framers at the time the Sixth Amendment was adopted." We rejected a similar argument in *Wilson, supra,* 11 Cal.5th at page 290, and Chhuon and Pan offer no persuasive reason to revisit our conclusion.

### D. Sufficiency of Evidence Claims

#### *1. Sufficiency of Evidence for Luu's Attempted Murder*

Pan asks us to reverse or reduce his attempted murder conviction of Luu because the evidence was insufficient to demonstrate an intent to kill, and further to reverse the finding that the attempted murder was willful, deliberate, and premeditated. We decline to do so.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.) "A finding of insufficient evidence is

the functional equivalent of a judgment of acquittal, upon which retrial is prohibited." (*People v. Hin* (2025) 17 Cal.5th 401, 455.) Even though we are reversing Pan's judgment, we therefore address Pan's sufficiency of the evidence claim to determine whether retrial is permissible. (*Ibid.*)

" 'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.] 'Intent to unlawfully kill and express malice are, in essence, "one and the same." ' [Citation.] Express malice requires a showing that the assailant either desires the victim's death or knows to a substantial certainty that the victim's death will occur." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890 (*Covarrubias*).)

" '[T]o be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing — which means that the person guilty of attempted murder as an aider and abettor must intend to kill.' [Citation.] [¶] 'Whether a person has aided and abetted in the commission of a crime ordinarily is a question of fact. . . . [¶] . . . [¶] Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1054 (*Nguyen*).)

Pan argues there was insufficient evidence of an intent to kill Luu by either Chhuon or Pan. We disagree. Chhinkhathork testified that after checking the apartment out, he told the men there were three people in the apartment. The men discussed —

and Pan specifically said — that they would go inside, "force [the occupants] to give up their property and if they didn't follow orders, they would be shot." Chhuon, Pan, and Evans then walked, in single file, toward the apartment, and Chhuon carried a loaded handgun. When Chhuon entered the apartment and shot at the three occupants, the jury could conclude that Chhuon had put their plan into action. (Cf. *Covarrubias*, *supra*, 1 Cal.5th at p. 892.)

Hung and Nghiep were shot in the chest and head, respectively, and killed. During this same brief attack, Luu was shot in her leg from a close range. " 'The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill.' " (*Covarrubias*, *supra*, 1 Cal.5th at p. 892; cf. *People v. Smith*, *supra*, 37 Cal.4th at p. 742.) " ' "The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance." ' " (*Smith*, at p. 741.) To the extent Pan argues that Chhuon intended only to wound or disable Luu, "while such a scenario might be possible, we presume in support of the verdict the existence of every fact that can be reasonably inferred from the evidence." (*People v. Houston* (2012) 54 Cal.4th 1186, 1217.) Chhinkhathork testified that after hearing gunshots, he then saw Chhuon, Pan, and Evans, together, run back toward the car. (See *Nguyen*, *supra*, 61 Cal.4th at p. 1054 [factors to consider in making the determination of aiding and abetting include companionship and conduct after the offense].)

Viewing all of the evidence in the light most favorable to the judgment, we conclude a reasonable trier of fact could find

Chhuon and Pan intended to kill Luu. "Appellate inquiry into the sufficiency of the evidence 'does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." [Citation.] Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In other words, 'it is the jury, not the appellate court which must be convinced of the defendant's guilt.' " (*Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.)

Pan next argues there was insufficient evidence to support the finding that the attempted murder was willful, deliberate, and premeditated. (See § 664, subd. (a).)[6] " ' "[P]remeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' [Citation.] 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported — preexisting motive, planning activity, and manner of killing —

---

[6] Section 664, subdivision (a) requires only "that the murder attempted was willful, deliberate, and premeditated," and does not require "that an attempted murderer personally acted willfully and with deliberation and premeditation, even if he or she is guilty as an aider and abettor." (*People v. Lee* (2003) 31 Cal.4th 613, 616.)

but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118–119.) Here, as noted, before approaching the apartment, Chhuon and Pan discussed that they would go inside, "force [the occupants] to give up everything and if they didn't follow orders or directions they would start shooting." Luu then was shot in her leg from a close range. We conclude that based on this record, a reasonable trier of fact could conclude the attempted murder was willful, deliberate, and premeditated.[7]

---

[7] Pan also challenges his convictions for the murder of Nghiep and Hung based upon subsequent modifications to sections 188 and 189 by Senate Bill No. 1437 (2017–2018 Reg. Sess.) and ensuing legislation. (Stats. 2018, ch. 1015, § 4.) Assuming Pan's claim has merit, the proper remedy where there is a failure of proof due to " 'newly required elements [that] were "never tried" to the jury . . . is to remand and give the People an opportunity to retry the affected charges.' " (*People v. Cooper* (2023) 14 Cal.5th 735, 747.) Since we are already reversing Pan's judgment in its entirety, we do not address Pan's claims for relief under Senate Bill No. 1437 herein. Unless otherwise noted, we similarly do not address Pan's other remaining claims, including claims concerning the excusal of Prospective Juror No. 15; asserted ineffective assistance of counsel regarding eyewitness identifications; the denial of Pan's motion to substitute counsel; the asserted improper admission and exclusion of certain testimony by Kunthea Sar and William Evans and the asserted improper questions asked of Sar by the prosecutor; Pan's absence from the readback of testimony; the alleged presentation of witnesses by defense counsel against Pan's wishes; asserted ineffective assistance of counsel for the presentation of evidence on antisocial personality disorder; the prosecutor's alleged improper cross-examination of Dr. Thomas; the use of a single death verdict form; the denial of a motion for a new penalty trial; RJA claims based upon defense counsel's language; and asserted instructional errors.

### 2. *Sufficiency of the Evidence for Pan's Three Special Circumstances Allegation True Findings*

Pan claims that because he was not the actual killer, did not intend to kill Nghiep or Hung, was not a major participant in the underlying felonies, and did not act with reckless indifference to human life, there was insufficient evidence to support the three special circumstance allegation true findings.

As to Pan's contention that there was insufficient evidence to support the special circumstances, we disagree. The trial court instructed the jury that in determining whether the special circumstances were true or not true, "[i]f you find that a defendant was not the actual killer of a human being, or if you are unable to decide whether the defendant was the actual killer or an aider and abettor, you cannot find the special circumstance to be true unless you are satisfied beyond a reasonable doubt that such defendant with the intent to kill aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree, or with reckless indifference to human life and as a major participant, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of robbery or burglary which resulted in the death of a human being." Viewing all of the evidence in the light most favorable to the judgment, we conclude, for the reasons above, that a reasonable trier of fact could conclude that Pan, with the intent to kill, aided or abetted Chhuon in the murders of Nghiep and Hung. Further, we conclude, for the reasons below, that a reasonable trier of fact could conclude that Pan, with reckless indifference to human life and as a major participant, aided or abetted Chhuon in the crime of robbery or burglary which resulted in the deaths of Nghiep and Hung.

"We analyze the totality of the circumstances to determine whether [the defendant] acted with reckless indifference to human life. Relevant factors include: Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony? [Citation.] ' "[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).)

We also analyze the totality of the circumstances to determine "whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major.' " (*People v. Banks* (2015) 61 Cal.4th 788, 803.) Relevant factors include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is

51

necessary, nor is any one of them necessarily sufficient." (*Ibid.*, fn. omitted.)

Here, a reasonable trier of fact could conclude that Pan acted as a major participant with reckless indifference to human life. Pan was involved in planning the robbery: Chhuon, Pan, Chhinkhathork, and Evans discussed robbing the Le family apartment, and after Chhinkhathork surveilled the apartment, he told the men that there were three people inside it. The men discussed — and Pan specifically said — that they would go inside, "force [the occupants] to give up their property and if they didn't follow orders, they would be shot." Chhuon carried a loaded handgun, and Amie testified that while she was sitting on the stairs outside the apartment, three men, in single file, approached her family's apartment. Pan was thus aware that the apartment was occupied and that Chhuon was armed; nevertheless, he followed Chhuon towards the apartment. Pan himself had suggested that they shoot the apartment's occupants if they refused to comply with the robbery. Chhuon then entered the apartment and shot Luu, Hung, and Nghiep. After hearing gunshots, Chhinkhathork saw Chhuon, Pan, and Evans run back together toward the car. After the murders, Pan stayed with Chhuon and Evans as they fled the scene together. On this record, there was sufficient evidence that Pan acted as a major participant and with reckless indifference to human life. (See *People v. Williams* (2015) 61 Cal.4th 1244, 1281–1282; see also *Clark*, *supra*, 63 Cal.4th at p. 614; cf. *People v. Emanuel* (2025) 17 Cal.5th 867, 895–896; *Scoggins*, *supra*, 9 Cal.5th at p. 683.)

### *3. Pan's Gang Enhancements Under the Current and Former Law and Admission of Gang Evidence*

Chhuon and Pan claim that recent legislative amendments to the gang enhancement statute require reversal of their gang enhancements. The Attorney General concedes that these recent legislative amendments require reversal of Chhuon's and Pan's gang enhancements because the currently charged offense may no longer be used to establish the requisite "pattern of criminal gang activity." (§ 186.22, subd. (e)(2).) We agree.

Section 186.22 prescribes increased punishment for "a[ny] person who is convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Section 186.22 was amended in several respects by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333), which became effective on January 1, 2022, and which changes apply to all cases that are not yet final as of the legislation's effective date. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206–1207 (*Tran*).)

Assembly Bill No. 333 imposed stricter requirements for finding gang enhancements. Relevant here, Assembly Bill No. 333 mandates that a currently charged offense may no longer be used to establish the requisite "pattern of criminal gang activity." (§ 186.22, subd. (e)(2).) Among other requirements, a criminal street gang must have members who "collectively engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f).) To demonstrate "a pattern of criminal gang activity," (*ibid.*) the amended statute requires, among other things, proof of at least two enumerated predicate

offenses that were "committed on separate occasions or by two or more members"; that "commonly benefited a criminal street gang"; and whose common benefit "is more than reputational." (§ 186.22, subd. (e)(1).) Previously, the statute permitted the currently charged offense to be used to establish the required pattern of criminal gang activity. (*People v. Loeun* (1997) 17 Cal.4th 1, 4–5 (*Loeun*).) However, the statute now provides that "[t]he currently charged offense shall not be used to establish the pattern of criminal gang activity." (§ 186.22, subd. (e)(2).)

As the Attorney General concedes, the record shows that Chhuon's and Pan's juries were not instructed that the currently charged offenses could not be used to establish a pattern of criminal gang activity. "When a substantive change occurs in the elements of an offense and the jury is not instructed as to the proper elements, the omission implicates the defendant's right to a jury trial under the Sixth Amendment, and reversal is required unless 'it appears beyond a reasonable doubt' that the jury verdict would have been the same in the absence of the error." (*Tran, supra,* 13 Cal.5th at p. 1207.) The Attorney General also concedes that the prosecution's sole basis here for proving the predicate gang offenses necessary to establish a pattern of criminal gang activity was the charged offenses. Chhuon's and Pan's juries therefore could have found a pattern of criminal gang activity based on the charged offenses. We consequently cannot say, on this record, that there is no reasonable doubt that the jury's gang enhancement findings would have been the same if the jury had been instructed under the new law. (See *Tran*, at p. 1207; see also *People v. Lamb* (2024) 16 Cal.5th 400, 454–455; *People v. E.H.* (2022) 75 Cal.App.5th 467, 479 ["we cannot conclude the jury

instructions were harmless beyond a reasonable doubt" where, among other things, "the jurors were permitted to consider the current offenses in determining whether the prosecution had proven a pattern of criminal gang activity"].) We thus vacate their gang enhancements.

As a separate issue, Pan claims that retrial of his gang enhancements would be barred by double jeopardy principles because the evidence was insufficient to support his gang enhancements under the former law as it existed at the time of his crimes. Pan challenges the sufficiency of evidence under the former law to establish (1) that TRG was a criminal street gang and (2) that he had the required gang-related motives. We disagree and reject these arguments in turn below.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence." (*People v. Renteria* (2022) 13 Cal.5th 951, 970 (*Renteria*).) The gang enhancements in this case applied only to the Pomona crimes, i.e., the Avina murder and the Huerta attempted murder, and gang enhancements were not found for the Sacramento murders.[8]

---

[8] The trial court granted the defense motion pursuant to section 1118.1 regarding the gang enhancements for the Sacramento crimes.

Pan first argues that under the former law the evidence failed to show that TRG was a criminal street gang. At the time of the Pomona crimes, in order to establish that TRG was a criminal street gang, the prosecution was required to prove " 'that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting *two or more* of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period.' " (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047.)

Pan challenges only the second of these three elements necessary to establish that TRG was a criminal street gang — that TRG has as its primary activities the commission of one or more crimes listed in the statute. "Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute. Also sufficient might be expert testimony . . . ." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324.)

In this case, a reasonable trier of fact could conclude under the former law that TRG has as its primary activities the commission of one or more crimes enumerated in the statute. The Sacramento murders, the Pomona murder, and the Bun murder — over less than two weeks — constituted sufficient evidence that the commission of such crimes was one of TRG's "primary activities." (Cf. *People v. Vy* (2004) 122 Cal.App.4th 1209, 1212 [three violent crimes committed by

defendant's gang over less than three months constituted sufficient evidence that the commission of such predicate crimes was one of the gang's primary activities].) This was consistent and repeated criminal activity. (See *People v. Sengpadychith*, *supra*, 26 Cal.4th at p. 324.) We consequently conclude that the evidence was sufficient to support the "primary activities" element necessary to establish that TRG was a criminal street gang under the former law.

Though Pan does not specifically challenge the remaining two elements necessary to establish that TRG was a criminal street gang, sufficient evidence supports them as well. First, a reasonable trier of fact could conclude under the former law that TRG members have engaged in a "pattern of criminal gang activity" by committing, attempting to commit, or soliciting two or more predicate offenses during the statutorily defined period. As noted above, the former law before it was amended permitted the currently charged offense to be used to establish the required pattern of criminal gang activity. (*Loeun*, *supra*, 17 Cal.4th at pp. 4–5.) Specifically, the former law permitted "the requisite 'pattern' [to] be established by evidence of the offense with which the defendant is charged and proof of another offense committed on the same occasion by a fellow gang member." (*Id.* at p. 5.) Both before and after the amendments, homicide is an offense that can be used to establish a pattern of criminal gang activity. (§ 186.22, subd. (e)(1)(C).) There was also evidence that both Chhuon and Pan were senior members of TRG. The Sacramento murders and the Pomona murder, which Chhuon and Pan were both convicted for, could therefore be used under the former law to establish the required pattern of criminal gang activity and constituted sufficient evidence of a pattern of criminal gang activity.

Second, a reasonable trier of fact could conclude that TRG is an ongoing association of three or more persons with a common name or common identifying sign or symbol. For illustration, Evans testified that he was a TRG member, and that Chhuon and Pan had special standing in TRG as "original gangster[s]." Sar testified that she was a TRG member as well. We therefore conclude that under the former law, a reasonable trier of fact could conclude that TRG was a criminal street gang.

Pan next argues that under the former law the evidence was insufficient to establish that he had the required gang-related motives. At the time of the Pomona crimes, the gang enhancement applied to " 'any person' convicted of a number of enumerated felonies, including murder . . . that were (1) 'committed for the benefit of, at the direction of, or in association with any criminal street gang,' and (2) 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 331 (*Rivera*).) "[I]n cases where multiple gang members were involved in the charged offense, the fact of their joint involvement in a crime often provides sufficient evidence of association and benefit, as well as circumstantial evidence of an intent to promote the criminal activit[ies] of other gang members, in connection with the very same criminal offense." (*Renteria*, *supra*, 13 Cal.5th at p. 963.) "[I]f substantial evidence establishes that the defendant intended to and did commit the charged felony with known members of a gang, the jury may fairly infer that the defendant had the specific intent to promote, further, or assist criminal conduct by those gang members." (*People v. Albillar* (2010) 51 Cal.4th 47, 68.)

We conclude that under the former law, there was sufficient evidence of the requisite gang-related motives. The

evidence showed that Chhuon and Pan were "original gangster[s]" in the TRG and that together they shot at Avina and Huerta who they mistakenly believed were rival gang members. The fact that defendants believed that the Pomona crime victims (Avina and Huerta) were members of a rival gang, even though the belief was mistaken, provides reasonable inference of a gang-related motive. As the trial court found, "the motivation for the [Avina] killing was a perception that the victims were alleged rival gang members, and I think that implied therein is a benefit for the street gang, namely the elimination of rivals."

In support of this, the Attorney General argues that testimony from Sar and Evans shows that Chhuon and Pan believed the victims were members of a rival gang and there was no evidence to suggest a motivation other than the desire to attack gang rivals. Specifically, Sar testified that she and the others in the Toyota Celica at the time of the shooting were TRG members. She testified that immediately before the shooting she saw "a Hispanic individual standing in front of a yard holding rifle." The car she was in then made a U-turn back to that individual and she heard shots being fired from the front driver seat, where Chhuon was sitting; Pan then said "pass [me] the gun," and she heard more shots from the passenger seat where Pan was sitting. She testified that after the shooting either Chhuon or Pan said that they "thought that the man that was shot at was from a gang called 12th Street" because he was Hispanic. Evans testified that he was a member of the TRG gang and explained that he was present during a conversation between "Stacy, Giggles, and Crow" about a drive-by shooting in Pomona where the victim was believed to have been a member of "12 Street." Evans agreed that TRG "has problems in

Pomona" and that "12 Street" is "the name of the gang that T.R.G. has problems with in Pomona." Evans testified that "12 Street" is a "Mexican gang" known as "Serranos." Evans agreed that there "was an ongoing dispute in Pomona with them."

Moreover, the evidence showed that two days before the Pomona crimes, Chhuon, Pan, Evans, and two others were driving and looking for someone to kill; Evans and Pan then shot at Bun, who had been driving a car believed to belong to another rival gang member. And, as we discussed above, Bun's murder was admissible to prove Chhuon's and Pan's motive in Avina's murder. The evidence additionally showed that Chhuon and Pan used a gun from Bun's murder to shoot Avina and Huerta.

Viewing this evidence in the light most favorable to the judgment, we conclude that a reasonable trier of fact could find that Pan committed the Pomona crimes for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in any criminal conduct by gang members. As detailed above, the evidence suggested that Chhuon and Pan, together, shot at suspected (even if mistaken) rival gang members and did so with a gun that had been used two days earlier to murder another suspected rival gang member. And as we have said before, "a driveby shooting by a gang member of a rival gang member is a prototypical example of a gang-related crime." (*People v. Livingston* (2012) 53 Cal.4th 1145, 1171.) Indeed, in *Livingston*, we found substantial evidence that the defendant acted for the benefit of and in association with his gang and with the specific intent to promote, further, or assist in criminal conduct by gang members when defendant and two other gang members were driving in defendant's car and defendant shot at a rival gang member. (*Ibid.*) Similarly, in *Rivera*, we found substantial

evidence that the defendant acted to benefit and promote the gang when the defendant shot an investigating officer with a gun that had been used three days earlier in a gang-related shooting. (*Rivera, supra*, 7 Cal.5th at pp. 331–332.) On the record here, we thus conclude that a reasonable juror could find that Pan committed the Pomona crimes for the benefit of, at the direction of, or in association with a criminal street gang and with the specific intent to promote, further, or assist in any criminal conduct by gang members.

Lastly, Pan claims that the gang evidence was irrelevant and prejudicial and its admission violated due process and rendered his trial fundamentally unfair. Chhuon likewise argues that the gang evidence was irrelevant and prejudicial and its admission violated due process and risked an arbitrary capital sentencing. We reject these arguments.

" 'The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense.' [Citation.] 'Evidence of the defendant's gang affiliation — including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like — can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*People v. Pineda* (2022) 13 Cal.5th 186, 233–234.) "We review a trial court's ruling allowing the presentation of such evidence for an abuse of discretion." (*Id.* at p. 234.)

Here, the gang evidence was properly admitted to support the gang enhancement allegations. In addition, the gang evidence also would have been admissible for purposes of establishing that Chhuon and Pan were involved in the Pomona

crimes and for purposes of establishing their motive for those crimes. (See *People v. Ramirez* (2022) 13 Cal.5th 997, 1095 [fact that defendant and another person "were members of the same gang 'formed a significant evidentiary link in the chain of proof tying them to the crimes'"]; *People v. Flores* (2020) 9 Cal.5th 371, 398 (*Flores*) [gang evidence can be relevant to prove identity or motive]; *People v. Williams* (1997) 16 Cal.4th 153, 193–194 [gang evidence was relevant to prove motive].)

Nevertheless, Chhuon claims that the prosecutor repeatedly emphasized his gang involvement and points to specific gang evidence and arguments that, in his view, were irrelevant and prejudicial. He challenges, for example, testimony about Chhuon's and Pan's status within the gang; about various witnesses' gang membership; and about witnesses' concerns over testifying. But such testimony was relevant and not unduly prejudicial. Testimony about Chhuon's and Pan's status within the gang and about various witnesses' gang membership was relevant to show the relationship between these individuals. (See *Chhuon*, *supra*, 11 Cal.5th at p. 31 ["[e]vidence of defendant's gang membership was relevant to show his relationship with the accomplices who testified against him"].) Similarly, testimony about a witness's concerns over testifying was "'relevant to the credibility of that witness.'" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.)

To the extent Chhuon challenges testimony about committing other murders, including murders of children, the prosecutor asked Sar, in relevant part, whether she had heard Chhuon "talk about other murders," to which she replied affirmatively. When the prosecutor then asked, "And that includes murders where little children were killed," the trial

court sustained Chhuon's objection. On this record, there was no prejudice because Sar did not answer whether she had heard Chhuon talk about murders involving little children and the court instructed the jury that if an objection to a question was sustained, it was not to guess at what the answer might have been or assume to be true any insinuation suggested by it.

Chhuon also asserts that the trial court "set the stage for anti-gang bias" during voir dire when the court commented that joining a gang did not make sense, asked whether graffiti on a prospective juror's house made that juror mad, and responded "Oh, God" to a prospective juror's remarks about the juror's neighborhood being infested with gangs and gangs running out of walls to graffiti. Viewing these exchanges in context, we decline to find that the trial court erred or otherwise prejudiced the jury because the court's comments, even if somewhat intemperate, did not "set the stage for anti-gang bias" and did not rise to the level of a constitutional violation because they reflected the court's reasonable efforts to discern the prospective jurors' honest views regarding gang members in order to determine whether they were biased against them. Moreover, the court reminded the prospective jurors that "nobody in this court, in this trial is on trial for having been a gang member," and "[i]t's not a crime to be a member of a gang."

Chhuon lastly asserts that Sergeant Risedorph's testimony that TRG members from Long Beach refer to themselves as Strong Beach to show TRG's strength was "speculative character evidence." Not so. Sergeant Risedorph testified that he personally observed a man wearing a hat that said "TRG" and "Strong Beach," and this indicated to Sergeant Risedorph that the man probably was a TRG member from Long Beach. The fact that the word "strong" suggested "strength"

hardly called for speculation or conjecture, and this testimony did not amount to character evidence.

### E. Asserted Instructional Errors

*CALJIC No. 17.41.1*

Over objection, the trial court instructed the jury during the guilt phase pursuant to CALJIC No. 17.41.1: "The integrity of a trial requires that jurors at all times during their deliberations conduct themselves as required by these instructions. Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law, or to decide the case based on penalty or punishment or any other improper basis, it is the obligation of the other jurors to immediately advise the court of the situation." For the penalty phase, the court instructed the jury that the guilt phase instructions — except five specific instructions (not including CALJIC No. 17.41.1) — continued to apply in the penalty phase.

Chhuon claims that the trial court erred in instructing the jury pursuant to CALJIC No. 17.41.1 and this error violated his federal and state constitutional rights. We reject this claim. "[A]lthough we disapproved the use of CALJIC former No. 17.41.1 in future trials in 2002 [citation], we have repeatedly held 'that giving the instruction, although ill advised, does not violate a defendant's constitutional rights.' " (*Gomez*, *supra*, 6 Cal.5th at p. 303; accord, e.g., *People v. Wilson* (2008) 44 Cal.4th 758, 805.) Seeing no persuasive reason to reconsider our precedent, we see no basis to reverse his convictions or judgment. (See *People v. Penunuri* (2018) 5 Cal.5th 126, 158 ["this instruction is not a basis for reversing a conviction"]; *People v. Reed* (2018) 4 Cal.5th 989, 1017 [rejecting penalty

phase claim regarding CALJIC No. 17.41.1]; see also *People v. Banks* (2014) 59 Cal.4th 1113, 1170–1171.)

## III.   PENALTY PHASE ISSUES

### A. Chhuon's Penalty Phase Claims

#### 1. Photographs of Section 190.3, Factor (b) Crimes

Chhuon claims that the trial court erred by admitting, over objection, crime scene and autopsy photographs related to the Spokane and Elm Street murders.  This error, Chhuon claims, violated his state and federal constitutional rights to due process, a fair trial, and a reliable penalty determination.  We conclude that the trial court did not err, and even if it did, any error was harmless.

As a preliminary matter, Chhuon argues that in its ruling, the trial court erroneously relied on *People v. Anderson* (2001) 25 Cal.4th 543  (*Anderson*), in which we considered the admissibility of photographs related to the capital crime, as opposed to photographs related to other crimes.  In *Anderson,* we addressed the admissibility of crime scene and autopsy photographs related to the capital crimes.  We explained that a trial court "has *narrower* discretion under Evidence Code section 352 to *exclude* photographic evidence of the capital crimes from *the penalty trial* than from the guilt trial" because "the prosecution is entitled at the penalty phase to show [the circumstances of the capital crimes] in a bad moral light" and "because the defendant has already been found guilty of the capital crime, the potential for prejudice on the issue of guilt is not present." (*Id.* at pp. 591–592.)  Here, while discussing the photographs with defense counsel, the trial court referred to a bench guide that quoted *Anderson,* at page 591; stated its "understanding that in a penalty phase that Evidence Code

section 352 has a different function than in a guilt phase"; and asked for defense counsel's response. Defense counsel agreed "with what the court just read, that 352 does go under some alterations" but urged that "[352 does not go] completely out the window."

Chhuon contends that this colloquy demonstrates that "the trial court erroneously treated [the photographs related to the Spokane and Elm Street murders] as if they were photographs pertaining to the charged capital crimes rather than simply [section 190.3,] factor (b) aggravation." He attributes too much weight to this exchange. Even if the possible prejudicial effect of a particular photograph may differ depending on whether it is admitted pursuant to section 190.3, factor (a) or factor (b) (see *People v. Box* (2000) 23 Cal.4th 1153, 1201 [factor (b) evidence may be excludable under Evidence Code section 352 "insofar as it unfairly persuades jurors to find the defendant guilty of the crime's commission"; by contrast, "[t]his danger is not present with factor (a) evidence at the penalty phase because the jury has already found the defendant guilty of the capital offense"]), the colloquy does not demonstrate that the court applied an incorrect standard. The essence of the court's comment was that Evidence Code section 352 "has a different function" in the penalty phase. This is true: "[T]he court's discretion to exclude evidence under Evidence Code section 352 is somewhat narrower at the penalty phase than at the guilt phase of trial. [Citation.] The prosecution is entitled to present a full picture of the circumstances surrounding a defendant's prior criminal acts under section 190.3, factor (b)." (*People v. Bell* (2019) 7 Cal.5th 70, 129; *People v. Masters* (2016) 62 Cal.4th 1019, 1073; *People v. Jablonski* (2006) 37 Cal.4th 774, 834 ["with respect to uncharged-violent-crime

evidence, a trial court has narrower discretion under Evidence Code section 352 to exclude such evidence at the penalty phase"].) We thus decline to conclude that the trial court applied an incorrect standard based on its reference to *Anderson, supra*, 25 Cal.4th at page 591. We further reject Chhuon's contention that this rule (i.e., a trial court's narrower discretion in the penalty phase) is incorrect and unconstitutional. We have repeatedly relied on this rule and decline to revisit it here. (See *Bell*, at p. 129; *Masters*, at p. 1073; *Jablonski*, at p. 834.)

Chhuon next argues that the trial court failed to exercise its discretion because it did not consider and weigh each photograph. After hearing from the parties, the court concluded as to the Spokane photographs, "that if the defendant leaves persons in a gruesome state, the jury can consider the gruesome state in its entirety when they weigh the question of penalty in this case," and the court made "the same ruling" as to the Elm Street photographs. This ruling was terse and did not expressly address each photograph. But we decline to conclude that the court erred on this basis. (See *Rivera, supra*, 7 Cal.5th at p. 344 [" '[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352' "]; cf. *People v. Crittenden* (1994) 9 Cal.4th 83, 135 [no error in the "trial court's failure to provide detailed and precise descriptions of the weighing process it engaged in as to each photograph, pursuant to Evidence Code section 352"].)

Chhuon also argues that the trial court abused its discretion because the photographs had limited probative value, were unduly prejudicial, and were cumulative. " '[V]iolent "criminal activity" presented in aggravation may be shown in

context, so that the jury has full opportunity, in deciding the appropriate penalty, to determine its seriousness.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1175.) The disputed photographs concerned seven murders. The crime scene photographs were relevant to show that these murders occurred and the position and condition of the victims, and the autopsy photographs were relevant to show the manner of the murders and the nature of their injuries. Even though the photographs were numerous and several of them were gruesome, the court did not abuse its discretion in admitting them. (See *id.* at p. 1176 [autopsy photographs were relevant under section 190.3, factor (b) and, "while unpleasant, were not likely to evoke a visceral reaction disproportionate to the murder itself"]; *People v. Farnam* (2002) 28 Cal.4th 107, 185–186 [32 photographs of one victim were "clearly" relevant under section 190.3, factor (b), and even though "the number of photographs admitted here was relatively large and several were superficially similar," the court did not abuse its discretion]; cf. *Fayed, supra,* 9 Cal.5th at p. 196; *People v. Mills* (2010) 48 Cal.4th 158, 191 ["that the photographic evidence may have been cumulative to other evidence does not render it inadmissible"]; *People v. Sims* (1993) 5 Cal.4th 405, 452.)

We further conclude that even if the trial court erred in admitting some or all of the photographs, there was no prejudice. Chhuon argues that admitting the photographs unfairly prejudiced him because "it could make jurors more prone" to consider him to be the perpetrator of the Spokane and Elm Street murders, "even though the photographs provide no evidence on this point." We disagree. Separate from the photographs, other evidence described Chhuon's involvement in the Spokane and Elm Street murders. For the Spokane

murders, there was evidence that the victims' son identified Chhuon and Ly as the perpetrators and that Chhuon's fingerprint and Ly's palm print were found in the apartment. For the Elm Street murders, there was evidence that Evans, Chhuon, and Vinh (who was armed) entered the house in San Bernardino to rob its occupants. The trial court advised the jury that Chhuon had been convicted of five counts of first degree murder in San Bernardino County; the allegation that he personally used a firearm in the commission of those murders had been found to be not true.

Chhuon also argues the photographs "could blur the distinction between the crimes for which [he] was to be sentenced, and those that could be used only to determine his sentence," and "could have skewed the jurors' assessment of [his] death worthiness and diminished the effectiveness of the mitigation evidence presented." He adds that the "prosecutor repeatedly blurred the distinction between the charged crimes and those introduced as evidence in aggravation." The trial court, however, instructed the jury to consider the factors, if applicable, enumerated in CALJIC No. 8.85. As instructed, the jury could consider Chhuon's violent criminal activity, if the jury found "beyond a reasonable doubt that [he] did in fact commit the criminal act[s]." That included the seven murders in Spokane and on Elm Street. Considering these instructions and the evidence regarding those murders, we conclude there is no reasonable possibility that absent any error in admitting these photographs or in permitting the prosecutor's arguments that, according to Chhuon, "blurred the distinction between the charged crimes and those introduced as evidence in aggravation," the jury would have returned a more favorable verdict in the penalty phase.

### 2. Declining To Instruct on the Elements of Section 422

Chhuon claims that the trial court erred in declining to instruct on the elements of a criminal threat under section 422. He asserts that without such instruction, the instructions given misled the jury; and that a reasonable juror, properly instructed, could have found the evidence insufficient and disregarded it. This error, he claims, violated his federal constitutional rights by permitting the jury to weigh an invalid aggravating circumstance and rendering the penalty determination unreliable. We need not decide whether the court erred because any error was harmless.

Deputy Jury testified that Chhuon yelled that he was going to kill Jury and his family. Defense counsel requested the trial court instruct the jury regarding the elements of a criminal threat under section 422, but not regarding the elements of other crimes admitted in the penalty phase pursuant to section 190.3, factor (b). The court stated it would "give a definition for all the factor b crimes if [it was] going to give the elements of one" of them. Defense counsel responded, "If the court was sticking to the all-or-nothing, then it would be requested by the defense to give nothing." The court subsequently instructed the jury that it could consider evidence that Chhuon had committed several criminal acts, including the "threat to kill a San Bernardino County Deputy Sheriff on May 6, 1996, which involved the express or implied use of force or violence or the threat of force or violence." The court did not instruct on the elements of a criminal threat under section 422.

" '[A]bsent a request, the trial court has no duty to specify the names or elements of the unadjudicated crimes when instructing the jury on [section 190.3,] factor (b) evidence.' "

(*People v. Johnson* (2015) 61 Cal.4th 734, 778.)  "A trial court, however, may give such 'elements' instructions on its own motion when they are ' "vital to a proper consideration of the evidence." ' "  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1147.) And " '[i]f a defendant — or the prosecution — requests such an instruction' on the elements of defendant's alleged prior crimes, 'they are *entitled* to have the jury informed of the elements of the alleged other crimes.' "  (*People v. McDowell* (2012) 54 Cal.4th 395, 441.)

We need not decide whether the trial court erred here because any error was harmless.  In addition to the guilt phase evidence regarding the murders of Nghiep, Hung, and Avina and the attempted murders of Luu and Huerta, there was an overwhelming amount of penalty phase evidence regarding Chhuon's other brutal criminal activity.  Evidence showed Chhuon's involvement in seven murders — including three children — in Spokane and on Elm Street.  And while his actions toward Deputy Jury might have suggested his potential future dangerousness in prison, as Chhuon asserts, other evidence, such as his possession of weapons in jail, also suggested his potential future dangerousness in prison.  In these circumstances, any error was harmless beyond a reasonable doubt. (See *People v. Collins* (2010) 49 Cal.4th 175, 220 ["Error in the admission of evidence under [section 190.3,] factor (b) is reversible only if 'there is a reasonable possibility it affected the verdict,' a standard that is 'essentially the same as the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967)  386 U.S. 18,  24.' "]; cf.  *People v. Tuilaepa* (1992) 4 Cal.4th 569, 592 [no prejudice from not instructing on names and elements of section 190.3, factor (b) crimes]; *People v. Manibusan*  (2013)  58 Cal.4th 40,  98  [given  defendant's

numerous other criminal acts, any error regarding defendant's possession of weapons was harmless].)

## B. Challenges to the Death Penalty Statute

Chhuon claims that his death sentence violates due process and constitutes cruel and/or unusual punishment under the state and federal constitutions because he committed the murders when he was 22 years old. We reject his claim.

Chhuon argues that emerging science shows that persons under age 25 do not have fully developed brains and that they exhibit characteristics that diminish their culpability and make death sentences disproportionate to their crimes. He adds that his neurological development also "was stunted by violence, famine, and neglect." Chhuon further argues that there is now a national and international consensus against death sentences for persons under age 25. Chhuon emphasizes that some states recently have restricted certain punishments for persons above age 18 based on their state constitutions, and he urges us to do the same.

We previously have rejected similar arguments. (See *Tran*, *supra*, 13 Cal.5th at pp. 1234–1235; *Flores*, *supra*, 9 Cal.5th at pp. 429–430; *People v. Powell* (2018) 6 Cal.5th 136, 191–192.) "We have observed that 'the high court in *Roper* recognized that the " ' "qualities that distinguish juveniles from adults do not disappear when an individual turns 18," ' " but nonetheless held that the " ' "age of 18 is the point where society draws the line for many purposes between childhood and adulthood" ' " and is " ' "the age at which the line for death eligibility ought to rest." ' " ' " (*Tran*, at p. 1234.) We also have rejected similar arguments raised pursuant to our state Constitution. (See *ibid.* [arguing imposing the death penalty on

persons for crimes committed while they were 18 to 20 years old violates the state Constitution]; *People v. Gamache* (2010) 48 Cal.4th 347, 404–405.) We do so again here.

Chhuon additionally argues that the characteristics of persons under age 25 impair their ability to cooperate with their defense and preclude the individualized consideration and reliability of judgment required in death penalty cases.[9] We previously have rejected similar arguments and do so again here. (See *Tran, supra,* 13 Cal.5th at pp. 1234–1235 [concluding death sentences are not inherently unreliable for those aged 18 to 21].)

Chhuon and Pan raise a number of other challenges to the constitutionality of California's death penalty statute similar to those that we have repeatedly rejected. They provide no persuasive reason to revisit the following precedent:

"The death penalty is not unconstitutional for failing broadly to 'adequately narrow the class of murderers eligible for the death penalty.' " (*Simon, supra,* 1 Cal.5th at p. 149; see *People v. Schmeck* (2005) 37 Cal.4th 240, 304 (*Schmeck*).) "Penal Code sections 190.2 and 190.3 are not impermissibly broad, and factor (a) of Penal Code section 190.3 does not make imposition of the death penalty arbitrary and capricious." (*Sánchez, supra,* 63 Cal.4th at p. 487.) Chhuon identifies portions of the prosecutor's closing argument regarding the circumstances of the crimes in this case; those arguments do not lead us to a contrary conclusion.

---

[9]     Chhuon adds that the prosecutor's framing him "as a gang predator" perverted the mitigating aspects of youth and made them appear aggravating. For the reasons discussed above, the prosecutor's framing him as a gang predator was not improper.

The death penalty statute is not unconstitutional for failing to require "findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or factor (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235; see *People v. McDaniel* (2021) 12 Cal.5th 97, 148, 155 (*McDaniel*).) The high court's recent decisions interpreting the Sixth Amendment's jury trial guarantee (including *Hurst v. Florida* (2016) 577 U.S. 92) do not alter our conclusions. (See *Rangel*, at p. 1235; *People v. Lee* (2011) 51 Cal.4th 620, 651–652 (*Lee*).)

Chhuon claims that the prosecution should have the burden of proof in the penalty phase. We have made clear that the court's instructions need not "specify a burden of proof either as to aggravation (except for other crimes evidence) or the penalty decision." (*Schmeck, supra*, 37 Cal.4th at p. 305.) Chhuon alternatively claims that the court should have instructed the jury that there was no burden of proof. The court did so here. "The trial court need not instruct that there is a presumption of life." (*McDaniel, supra*, 12 Cal.5th at p. 157.)

Other than the penalty verdict itself, the jury need not achieve unanimity. (*Sánchez, supra*, 63 Cal.4th at p. 487.) " 'Nothing in the federal Constitution requires the penalty phase jury to . . . agree unanimously that a particular aggravating circumstance exists.' " (*People v. Williams* (2013) 58 Cal.4th 197, 295.) " 'The jury may properly consider evidence of unadjudicated criminal activity under section 190.3, factor (b) [citation], [and] jury unanimity regarding such conduct is not required . . . .' " (*People v. Rhoades* (2019) 8 Cal.5th 393, 455.) The high court's recent decisions interpreting the Sixth

Amendment's jury trial guarantee do not alter our conclusions. (See *People v. Rangel*, *supra*, 62 Cal.4th at p. 1235; *People v. McCurdy* (2014) 59 Cal.4th 1063, 1110–1111; *Clark*, *supra*, 63 Cal.4th at pp. 643–644.)

"The instructions were not impermissibly broad or vague in directing jurors to determine whether the aggravating factors were 'so substantial in comparison with the mitigating factors that it warrants death instead of life without parole.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 180.) "CALJIC No. 8.88 . . . is not unconstitutional for . . . using the phrase 'so substantial.' " (*Lee*, *supra*, 51 Cal.4th at p. 652.) We have rejected the argument that the phrase "so substantial" is vague, ambiguous, and provides insufficient guidance to the jury. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1361.) "Nor is the instruction ' " 'unconstitutional for failing to inform the jury that: . . . death must be the appropriate penalty, not just a warranted penalty.' " ' " (*Wilson*, *supra*, 11 Cal.5th at p. 318; see *People v. Case* (2018) 5 Cal.5th 1, 50.) The jury need not be instructed "that a verdict of life is required if it determines that the mitigating circumstances outweigh the aggravating ones." (*People v. Townsel* (2016) 63 Cal.4th 25, 72.) We have rejected the argument that "CALJIC No. 8.88 is unconstitutional because . . . the instruction fails to inform jurors that defendant does not have the burden of persuasion that death is not the appropriate penalty." (*People v. Lopez* (2013) 56 Cal.4th 1028, 1083–1084.) "The trial court does not have to instruct the jury that there is no burden of proof or requirement of jury unanimity as to mitigating circumstances . . . ." (*Lee*, at p. 652.) We reject Chhuon's related assertion that in the absence of such instruction, there was a substantial likelihood that the jury

believed there was a requirement of jury unanimity as to mitigating circumstances.

" 'Nothing in the federal Constitution requires the penalty phase jury to make written findings of the factors it finds in aggravation and mitigation.' " (*People v. Williams, supra,* 58 Cal.4th at p. 295.) Nor does the failure of the court's instructions to require specific written findings violate the constitutional right to "meaningful appellate review." (*People v. Parson* (2008) 44 Cal.4th 332, 370.) "Nor are potentially mitigating factors unconstitutionally limited by the adjectives 'extreme' and 'substantial'. . . ." (*Schmeck, supra,* 37 Cal.4th at p. 305.) The court's instructions need not "delete inapplicable sentencing factors" or "delineate between aggravating and mitigating circumstances." (*Ibid.*) "The jury need not be instructed that factors in mitigation may be considered only in mitigation." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 519 (*Mora*).) "CALJIC No. 8.85's instruction to the jury to consider 'whether or not' certain mitigating factors were present did not unconstitutionally suggest that the absence of such factors was aggravating." (*Lee, supra,* 51 Cal.4th at p. 653.) To the extent Pan relies on the prosecutor's argument regarding his antisocial personality disorder, we are not persuaded to reach a contrary conclusion or to conclude that his jury "aggravated his sentence upon the basis of what were, as a matter of state law, non-existent factors."

The absence of intercase proportionality review does not render the statute unconstitutional. (*People v. Pearson* (2013) 56 Cal.4th 393, 478 (*Pearson*).) " 'California does not deny capital defendants equal protection of the law by providing certain procedural protections to noncapital defendants that are not afforded to capital defendants.' " (*Mora, supra,* 5 Cal.5th at

p. 520; see *People v. Edwards* (2013) 57 Cal.4th 658, 767.) "California's use of the death penalty does not violate international law." (*Sánchez, supra,* 63 Cal.4th at p. 488; see *People v. Myles* (2012) 53 Cal.4th 1181, 1225; *People v. Butler* (2009) 46 Cal.4th 847, 885.) Imposition of the death penalty does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. (*People v. Adams* (2014) 60 Cal.4th 541, 581–582; see *People v. McCurdy, supra,* 59 Cal.4th at p. 1111.) Nor does any regularity of the death penalty's imposition violate international law or the Eighth Amendment. (See *Lee, supra,* 51 Cal.4th at p. 654; *Mora,* at p. 520.)

Finally, these asserted flaws, considered together, do not render the statute unconstitutional. (See *Pearson, supra,* 56 Cal.4th at p. 479; see also *Mora, supra,* 5 Cal.5th at p. 518.)

## IV. THE CALIFORNIA RACIAL JUSTICE ACT

Chhuon claims that his convictions and sentence are invalid under the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 3.5) (RJA). He alternatively asks us to remand his case to the superior court in the event we conclude that his claim does not warrant relief here. For the reasons that follow, we reject his claim.

### A. Applicable Law

"The Legislature passed the RJA in 2020 with a stated aim 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' [Citation.] To that end, the RJA prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the

basis of race, ethnicity, or national origin." (*People v. Wilson* (2024) 16 Cal.5th 874, 944–945.)

Relevant here, a defendant may establish a violation of the RJA by proving by a preponderance of the evidence that the following occurred: "(1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin"; or "(2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language about the defendant's race, ethnicity, or national origin, or otherwise exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(1), (2).) " 'Racially discriminatory language' means language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin. Evidence that particular words or images are used exclusively or disproportionately in cases where the defendant is of a specific race, ethnicity, or national origin is relevant to determining whether language is discriminatory." (§ 745, subd. (h)(4).) In Assembly Bill No. 1071 (2025–2026 Reg. Sess.) (Assembly Bill No. 1071), the Legislature affirmed "that in applying the RJA, courts consider evidence of racism's origins, insidious shifts, and current manifestations." (Stats. 2025, ch. 721, § 1, subd. (d).)

## B. Discussion

### 1. Gang Evidence and Nicknames

Chhuon claims that the prosecutor "invoked the perpetual foreigner stereotype" by using gang nicknames for Chhuon and other Southeast Asian American witnesses, and additionally "activated racialized stereotypes about gang members and appealed to racial bias" by doing so. Chhuon adds that the trial judge sometimes used gang nicknames for Chhuon and other Southeast Asian American witnesses, and that the prosecutor and the trial court suggested that the real names of these witnesses were difficult to pronounce.

We conclude that the prosecutor's and the trial court's use of Chhuon's nickname, Chaka, did not exhibit bias or animus "towards [Chhuon] because of [Chhuon's] race, ethnicity, or national origin" or constitute racially discriminatory language. (§ 745, subd. (a)(1), (2).) The prosecutor did not create this nickname. Rather, at a hearing outside of the presence of the jury, Sergeant Risedorph testified that in August 1995 (before this trial), Chhuon said "his nickname was Chaka." And numerous witnesses knew and used his nickname. For example, Chhinkhathork and Sar, among others, referred to Chaka in their testimony. (See also § 745, subd. (a)(2) [no RJA violation "if the person speaking is relating language used by another that is relevant to the case"].) By contrast, the prosecutor referred to Chhuon as Mr. Chhuon, not Chaka, in opening statements and closing arguments.

Moreover, Chhuon does not contend that the word "Chaka" has a derogatory meaning in and of itself but instead argues that the failure to use his full name constituted racial bias. We do not find it to be "language that, to an objective

79

observer, explicitly or implicitly appeals to racial bias." (§ 745, subd. (h)(4).) Thus, we do not find a violation of the RJA based on the prosecutor's and the trial court's use of Chhuon's nickname, Chaka.[10] However, while each situation is different, trial courts should exercise caution when nicknames are used.

We additionally find no violation of the RJA based on the prosecutor's and the trial court's use of gang nicknames for other Southeast Asian American witnesses. Notably, the RJA's relevant provisions prohibit bias or animus "towards the defendant because of the defendant's race, ethnicity, or national origin" and racially discriminatory language "about the defendant's race, ethnicity, or national origin." (§ 745, subd. (a)(1), (2).) In other words, the RJA's relevant provisions do not encompass bias or animus directed towards persons other than the defendant or racially discriminatory language about persons other than the defendant. Here, the prosecutor's and the trial court's use of gang nicknames for other witnesses, or comments regarding the spelling and pronunciation of Chhinkhathork's name, did not exhibit bias or animus "towards [Chhuon] because of [Chhuon's] race, ethnicity, or national origin" or constitute racially discriminatory language "about [Chhuon's] race,

---

[10] Chhuon argues that the trial court adopted the prosecutor's replacement of witnesses' true names with anglicized gang nicknames. He cites to an instance where the trial court prompted defense counsel to call Chhuon by his last name, rather than first, and another instance where the trial court stated, "[h]e is pointing at defendant Chaka." However, Chhuon's arguments concerning the trial court's language do not lead us to a different conclusion. For the same reason Chhuon's arguments with respect to the prosecutor's use of names must fail, so too must his arguments with respect to the trial court's use of the same names.

ethnicity, or national origin." (*Ibid*.) While the dissent states that "the prosecutor claimed he could not pronounce their names" (conc. & dis. opn. of Liu, J., *post*, at p. 4), Chhuon's briefing explains that the prosecutor commented about not being able to pronounce Chhinkhathork's name once in Chhuon's trial and once in Pan's trial. Furthermore, the prosecutor's use of a nickname for Chhuon does not stand out considering the use of nicknames for other witnesses and gang members (e.g., "Rusty," "Baby Sparky," "Grumpy," "Puppet," "Giggles," "Precious," "Shy Boy"). It therefore did not violate the RJA.

### 2. *Chhuon's Family's Immigration Status*

Chhuon claims that the prosecutor again invoked the perpetual foreigner stereotype by emphasizing Chhuon's family's immigration status. Chhuon points to the prosecutor's cross-examination of Chhuon's older brother in the penalty phase, during which the prosecutor asked him whether "they brought [him] [to the United States] free of charge," whether he paid to come to this country, and whether the Catholic Church provided him money to come to this country. While the language used here was somewhat indelicate and could doubtless be improved upon, the context in which the questioning occurred makes clear that these questions do not violate the RJA. (See *People v. Bankston* (June 1, 2026, S044739) ___ Cal.5th ___ [p. 102] (*Bankston*) ["we must carefully consider context when determining whether particular statements violate the RJA"].) As described further below, the trial court permitted defense counsel wide latitude in presenting evidence regarding the horrors experienced by Chhuon and his family in Cambodia. The purpose of this evidence was clear: to help to explain and mitigate why Chhuon may have committed the heinous crimes

he had now been convicted of. In context, as detailed below, the prosecutor's questioning was clearly an appropriate attempt to explain that Chhuon's life experiences should not justify or mitigate his crimes.

The defense's penalty phase case focused on Chhuon's difficult childhood and upbringing by presenting extensive testimony regarding the impoverished and violent conditions under the Khmer Rouge in Cambodia; the difficult conditions in the refugee camp in Thailand; and the racist and poor conditions in Alabama. Chhuon's brother then testified on direct examination to these difficulties and about his family coming to the United States and the difficulties they experienced adjusting to their lives in this country. For illustration, he testified to digging graves with Chhuon when they were approximately three and five years old in order to get food and water. After digging the graves, the brothers had to put "lot[s]" of dead bodies into graves, including those of women and children who had slashed throats or stomachs, or were shot in the face, or had a "langet" tied on their face. He testified to living with Chhuon in a Khmer Rouge camp for children where the children did not have shelter, blankets, or beds to sleep in, and instead simply slept in hay. If the children did not work when told or do what was told, soldiers would beat them, kill them, or tie them up and leave them in the sun with no water and no food. He testified that when Chhuon was approximately seven years old the two brothers watched the soldiers kill two people. He testified to being hungry with Chhuon and that because Chhuon was so skinny, you could count his ribs. He testified to walking with his siblings to Thailand at night in order to escape the Khmer Rouge when one time the people walking in front of them were blown up by landmines. He

testified to then living in a work camp in Thailand where they looked in the dumpsters for food or hunted rats or rabbits. He then transitioned to testifying about life in Mobile, Alabama, where people did not treat them well because they were different and did not speak English, they had to search for food, and their parents worked, and their mother drank "too much."

On cross-examination, the prosecutor then asked Chhuon's brother the following:

"Q. I've got a few questions about your life in general in Cambodia. As I understand from what you've had to say, that was a very, very difficult life; is that correct?

"A. Yes, sir.

"Q. And you came to this country when you were how old?

"A. I believe I was — they put me, my brother 9 or 10 years old.

"Q. And did you know any English when you came to this country?

"A. No, sir.

"Q. Mr. Chh[uo]n, your brother, he didn't know any English?

"A. No, sir.

"Q. This country, they brought you here free of charge? You didn't pay to come to this country, did you?

"A. We pay for the airplane.

"Q. You paid for the airplane?

"A. Yes.

"Q. Who gave you the money to pay for the airplane?

"A.  The — we were coming — the sponsor.

"Q.  Who sponsored you?

"A.  I don't remember, sir.  He a church, church priest.

"Q.  So the Catholic church gave you the money to come?

"A.  Yes.

"Q.  And were you brought to Alabama?

"A.  Yes, sir.

"Q.  And you went to school?

"A.  Yes, sir."

The prosecutor further asked Chhuon's brother if he had ever robbed anyone, killed anyone, or tied anyone up to which the brother responds in the negative to each question.  Chhuon's brother also agreed with the prosecutor that "despite having what obviously was a very, very difficult childhood and a difficult life, [he] kn[e]w the difference between right and wrong" and that it would be wrong to kill somebody.  Chhuon's brother further agreed with the prosecutor that "despite what [he] went through in Cambodia, [he] and [his] wife have been able to put a life together for [themselves] here in America."

In this way, the record does not support Chhuon's contention that the prosecutor was relying upon a stereotype that Southeast Asian immigrants were dependent on American welfare or that Chhuon or his family were undeserving welfare recipients.  Rather, the prosecutor's questioning focuses upon the opportunity Chhuon and his brother received to come to this country with the Catholic Church's assistance, in an effort to de-emphasize the difficulties they experienced adjusting to their lives in this country.  This line of questioning, in context, was clearly part of the prosecutor's broader argument that while

Chhuon's brother (and Chhuon) experienced difficulties in their childhood and upbringing, they did not justify or explain Chhuon's subsequent crimes, especially since Chhuon's brother, who encountered similar opportunities and difficulties, did not commit similar crimes. As the prosecutor put it, Chhuon's brother "despite what he's gone through . . . didn't turn into the killer being involved in these murders that his brother did." The dissent dismisses this crucial context. (See *Bankston*, *supra*, __ Cal.5th at p. __ [p. 102] ["we must carefully consider context when determining whether particular statements violate the RJA"].) But given the incredibly graphic details that the trial court permitted regarding Chhuon's childhood, the prosecutor was fairly permitted some latitude in attempting to diffuse the emotive power of that presentation. The dissent has its own theories on the manner in which the prosecution should have responded to this evidence and proposes alternative modes of argument that it believes would have been preferable. (Conc. & dis. opn. of Liu, J., *post*, at pp. 9–10.) But that is not the test here. The question is whether the language used "explicitly or implicitly appeals to racial bias" (§ 745, subd. (h)(4)) and, read in context, the answer is "no."

But even if we conclude that the prosecutor's questions to Chhuon's brother violated the RJA, we conclude beyond a reasonable doubt that the violation did not contribute to the judgment. For the reasons that are stated in *Bankston*, we apply a prejudice analysis here. (See *Bankston*, *supra*, __ Cal.5th at p. __ [pp. 108–124].) Reviewing the error for harmlessness here, we find no prejudice. The challenged questions to Chhuon's brother were brief. And the jury was instructed to "not assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and

may be considered only as it helps you to understand the answer." Furthermore, the guilt phase evidence regarding the murders of Nghiep, Hung, and Avina and the attempted murders of Luu and Huerta was particularly damaging to Chhuon as the evidence showed that he entered the Le family apartment, shot Luu in her hip, shot and killed Nghiep with a gunshot wound to his head, and shot and killed Hung with a gunshot wound to his chest. There was also an overwhelming amount of penalty phase evidence regarding Chhuon's other brutal criminal activity, including his involvement in seven murders — three of them children — in Spokane and on Elm Street. Specifically, Chhuon's fingerprint was found on the inside of the front door of the Spokane apartment where those murders occurred. The victims there were bound, stabbed and robbed before being shot to death. The victims' son, who was present, identified Chhuon as the killer. The jury was further instructed that Chhuon was found guilty of the five Elm Street murders. The jury additionally heard evidence that Chhuon raped a 14-year-old at knifepoint. The dissent does not engage in a typical weighing of the evidence that we apply when assessing prejudice but instead simply concludes without analysis that the errors it identifies were prejudicial. (Conc. & dis. opn. of Liu, J., *post*, at p. 11.) However, upon careful consideration of the strength of the aggravating evidence and the briefness of any RJA violation, we conclude beyond a reasonable doubt that the violation did not contribute to the judgment.

### 3. *Buddhism*

Chhuon next claims that the prosecutor invoked the perpetual foreigner stereotype by suggesting that he should have but did not demonstrate Buddhist values.

86

Chhuon notes that the prosecutor emphasized in closing argument that a social worker Charleson Kanly testified on cross-examination that he had assisted thousands of Cambodian refugees and none of them (aside from Chhuon) had "ever committed murder, because it's just totally against the Cambodian people" and "that one of the major tenets, one of the most important things about Buddhism is a reverence for all life." However, this argument by the prosecutor was directly based upon Kanly's testimony in which he agreed that he "had done a lot of work to help other people, thousands of people" who "went through the Thai camps" and "none of them became murderers" and that "one of the major tenets, one of the most important things about Buddhism is a reverence for all life." And the prosecutor's argument based upon this testimony fell within the prosecutor's broader argument, detailed in the section above, that Chhuon's childhood experiences did not justify or otherwise explain his later crimes.

Furthermore, the prosecutor's argument was directly responding to the defense's extensive presentation of evidence and argument in the penalty phase regarding Chhuon's difficult childhood. In the penalty phase opening argument, the defense argued extensively about how horrible Chhuon's childhood was under the Khmer Rouge in "the killing fields of Cambodia" and then in "one of the worst neighborhoods that America had to offer" in Alabama. For illustration, defense counsel argued that Chhuon had "seen death by torture, not just on one occasion, not on two occasions, not on twelve occasions, but every day of his life from the age of three until eight years old."

During the penalty phase, the defense then presented the social worker Kanly's extensive testimony about how difficult life under the Khmer Rouge was in Cambodia. The dissent

argues that the narrative that a "*good*" Cambodian is a Buddhist Cambodian continued with the admission of Kanly's testimony. (Conc. & dis. opn. of Liu, J., *post*, at p. 7.)[11] However, in his briefing before this court, Chhuon does not directly rely upon Kanly's testimony, but instead bases his argument on the prosecutor's more limited discussion of Kanly's testimony during closing argument. Indeed, Chhuon does not even directly cite any of Kanly's testimony that is discussed in the dissenting opinion. (*Id.* at p. 7.) This is for good reason, as the entirety of Kanly's testimony was presented at defendant's request and involved a different prosecutor questioning Kanly in a different proceeding. Specifically, the defense requested that Kanly be declared an unavailable witness and that Kanly's testimony from another proceeding be read into the record. The prosecutor objected that "there is much of the cross examination that I wouldn't have asked, and if the court allows it, I am going to ask the court to take out portions of the cross examination that I don't want." The prosecutor proceeded to identify portions of the

---

[11] To make its points, the dissent refers to the prosecutor suggesting that Chhuon's conduct and character were to be evaluated against a "Cambodian standard" or "Buddhist standard." (Conc. & dis. opn. of Liu, J., *post*, at p. 10.) Elsewhere the dissent repeatedly refers to the prosecution's narrative that Chhuon defied the "*good*" Cambodian immigrant stereotype and that Chhuon "fell short of behaving as a good Cambodian or Buddhist should" and that "Chhuon's actions defied not only the law but also that tenet of Buddhism." (*Id.* at pp. 4, 5, 7, 9–10.) The dissent also explains that the prosecutor emphasized Chhuon's failure to strive for the American Dream and to live up to a variation of the model minority myth. (*Id.* at p. 1.) To clarify, *none* of these are phrases the prosecution ever used at trial and this would be a very different case if they were. Instead, these phrases are the dissent's *characterization* of what the dissent thinks the prosecutor was conveying to the jury.

cross examination, including one portion "going into Buddhism" and stated, "I am simply not interested in going into that, and I wouldn't ask those questions. I wouldn't have asked them, and I ask that the court take that out." The court declared that Kanly was unavailable and declined the prosecutor's request to redact the portions of the prior prosecutor's cross-examination on Buddhism because the defense was "entitled to" present the testimony in its "entirety." The dissent dismisses all of this important context. Nor does the dissent grapple with the significance of the fact that it was defense counsel who sought to have this testimony admitted as mitigation evidence and the testimony was ultimately admitted over the objection of the prosecution. Instead, the dissent frames the very testimony that the prosecution sought to exclude as evidence of an RJA violation *by the prosecution*. Thus, though the dissent acknowledges that "[n]o one disagrees" that context matters (*id.* at p. 3), the dissent comes to a conclusion ultimately stripped of vital context. It concludes — in an argument that not even Chhuon himself makes — that when defense counsel proffered evidence from a prior proceeding over the prosecution's objection, that very evidence can now be used to demonstrate that the prosecution violated the RJA and defendant's death sentence must be reversed. We disagree.

Ultimately, Kanly's entire testimony from a prior proceeding was read to the jury. As read to the jury, Kanly testified that the Khmer Rouge "want[ed] to destroy not even, you know, the culture. They want[ed] to destroy even the religions. You know, they let the people go to bring in the Buddha, you know, from the temple down the road and kick it. The Buddha, and they don't want to have you know the religion in the country." Kanly was an officer in the Cambodia Army

when the Khmer Rouge arrived and had to hide his identity because the Khmer Rouge would kill any officer in the Cambodian army. He testified to being forced to leave the city he lived in by himself and without his family because if the Khmer Rouge "say you go right. You have to go right. If they say go left, you go left. If not, they are going to kill you right here." He was forced to walk for two months until he reached a camp he called a "farm city." When he got there, he had to find his own shelter and build a "doghouse" to live in. He was only able to eat scraps of rice or salt because the Khmer Rouge did not provide meals. One can of rice was given to fifteen people twice per day.

Kanly's testimony continued to explain how there was a line at the camp that people were forbidden from crossing. Kanly saw "more than one hundred children" try to cross the line to find food and then get shot and killed right there. There were about 800,000 to 900,000 people at the camp, but around six months in, the Khmer Rouge killed most "leav[ing] like 24,000." Kanly's camp was then combined with another. Kanly's testimony detailed how fathers, mothers, and children were all separated into different camps and were not allowed to see each other. Any child that had enough schooling to learn a foreign language was killed. If anyone disobeyed a Khmer Rouge soldier or ate something they were not allowed to, the person was beaten to death with a stick. Kanly saw this happen "a lot" and most of the people he was there with died. While in the camps, he had to work every day from 3:00 a.m. until noon and then, after a 15 or 20 minute break to eat, work until 5:00 or 6:00 p.m. If a person was too sick to work, the person was not given any medical attention or any food to eat or water to drink. If anyone moved at night, the Khmer Rouge would kill them. If

a child cried at night, the child would be taken and never seen again.

Kanly's testimony described how he was only able to leave the camp when the Vietnamese took over the country and the Khmer Rouge "escape[d] to the jungle." He walked for nine or ten days with no food until he found some Vietnamese soldiers who gave him food. Afterwards, he found his wife, but he never found his children and heard they were all killed. He testified that the situation was worse than depicted in a film about the "killing fields" of the Khmer Rouge. In this way, the defense presented Kanly's extensive testimony described above from a prior proceeding about how difficult life under the Khmer Rouge was.

After Kanly's testimony was read to the jury, the defense then presented a 15-minute video compilation excerpted from documentary films showing the atrocities in Cambodia under the Khmer Rouge. The court admitted the video exhibit, over the prosecutor's objection, noting that "what the defense wants to use this tape for is to show the conditions in Cambodia were terrible, that you had famine, you had depression, and you had people that were dying. [¶] There are vivid photographs of children with flies on their faces, their stomachs protruded, their bones showing; clearly, in some extreme conditions, and there are a number of photos of different children." The video was then shown to the jury. It depicted stacked bones and skulls, mass graves with dead bodies, and bombs exploding. The video narrates about how dying children were carried off in plastic bags and the old and crippled were dumped on the side of the road. The narration states that the price of a Cambodian life was $100 and that the war caused a million dead and wounded. The narrator described a camp in Cambodia where

12,000 people died as the "Asian Auschwitz" and described people being tortured, hanged, drowned, disemboweled, and electrocuted.  The video extensively depicted starving children and ends with several minutes of video on the stark conditions of a refugee camp in Thailand.

This context makes clear that the defense framed the penalty phase in broad generalizations about Cambodia and the role of religion in the country under the Khmer Rouge.  The prosecutor's arguments — that murder is "just totally against the Cambodian people" and "that one of the major tenets, one of the most important things about Buddhism is a reverence for all life" — were based directly upon Kanly's testimony that the defense had presented.  In fact, as noted above, the court declined the prosecutor's request to redact the portions of Kanly's testimony on Buddhism because the defense was "entitled to" present the testimony in its "entirety."  The jury then heard Kanly's testimony that none of the thousands of people he worked with who went through the Thai camps "became murderers" and that "one of the major tenets, one of the most important things about Buddhism is a reverence for all life."  Indeed, as detailed above, the trial court gave defense counsel wide latitude in presenting video and testimonial evidence regarding the horrors experienced by those living under the Khmer Rouge in Cambodia in order to mitigate Chhuon's criminal behavior.  The prosecutor in closing arguments was simply responding to the defense's extensive presentation of such evidence.  (See *People v. Taylor* (2010) 48 Cal.4th 574, 603 ["the penalty phase determination is ' "inherently moral and normative" ' "].)  The dissent dismisses this context, arguing that it merely suggests that perhaps the prosecution did not *intend* to appeal to racial bias.  (Conc. & dis.

opn. of Liu, J., *post*, at p. 4.) But this misunderstands what we mean about context. Context is not important because of what it can or cannot tell us about what is in the speaker's heart. The point is that, read in conjunction with the surrounding presentation of evidence, the jury would not have understood Chhuon as being held, as the dissent concludes, to a "Cambodian standard" or "Buddhist standard." (*Id*. at p. 10.) It was instead a response to a highly evocative and emotional presentation from the defense in which the defense argued — with video depicting stacked bones and skulls, mass graves with dead bodies, and with accompanying narration about how dying children were carried off in plastic bags and the old and crippled were dumped on the side of the road — that historical violence perpetrated in Cambodia helped explain and mitigate Chhuon's own violent conduct. Considering the prosecutor's argument in context, we do not find that the prosecutor used racially discriminatory language or otherwise exhibited "bias or animus towards" Chhuon because of his race, ethnicity, or national origin; rather, the argument sought to convince the jury that, contrary to the defense's penalty phase case, Chhuon's childhood experiences did not justify or otherwise explain his later crimes. (§ 745, subd. (a)(1), (2); see *Bankston*, *supra*, __ Cal.5th at p. __ [p. 102] ["we must carefully consider context when determining whether particular statements violate the RJA"].)

Chhuon also argues that the prosecutor invoked racial stereotypes in the penalty phase by cross-examining Chhuon's father (Marith) about how Buddhists "have an absolute reverence for human life" and then by reading this testimony during closing arguments. Chhuon argues that by doing so the prosecutor implied that Chhuon had breached a core tenant of his Cambodian identity. However, as detailed below, Marith

was called as a defense witness and testified extensively on direct to how brutal life in Cambodia and then Alabama was during Chhuon's childhood. Furthermore, the prosecutor's subsequent cross-examination and argument about Marith's testimony fell within the prosecutor's broader argument that Chhuon's father tried to teach his children to do the right thing and to know the difference between right and wrong, and that Chhuon's upbringing thus did not explain or justify his later crimes. As this context makes clear, the prosecutor's cross-examination and subsequent argument about Marith's testimony was not an appeal to racial bias or animus but rather was a response to the defense's extensive presentation of evidence and argument regarding Chhuon's difficult childhood and upbringing under the Khmer Rouge in Cambodia, in the refugee camp in Thailand, and in Alabama.

Marith, in response to questions from defense counsel, gave a brutal description of life in Cambodia and Alabama during Chhuon's childhood. He testified on direct about how he (Marith) was tied up, handcuffed, held at gunpoint, taken away from the family to a dark metal prison called the "horse claw" where he was then shackled, beaten, and tortured. Marith further testified about hiding in a cave for eight days with Chhuon and another one of his sons without food or water until being captured by soldiers. Marith then segways to life in Alabama and how difficult life was here in the United States. He repeats multiple times that he did not have time to take care of Chhuon. He explains that sometimes other kids would beat Chhuon, and sometimes Chhuon would "spend time by the dumpster and the police brought him to me." The intended implications of this testimony to the jury were clear: Chhuon's

horrible upbringing helped to explain why he committed the crimes at issue.

Then, on cross-examination, the prosecutor responded to this line of questioning from the defense by asking Marith about each of Marith's other children who are working and living positive lives before turning the focus to how Marith tried to raise his children properly:

"Q. And you came to this country with your family almost 20 years ago; is that correct?

"A. Yes.

"Q. And you've worked hard your life?

"A. Yes.

"Q. And you've done the best you can to provide for your family?

"A. Yes.

Q. And you taught your children the difference between right and wrong?

"A. Yes, I did.

"Q. And let me ask you this, sir. You yourself — and this is not meant to invade your privacy — but you are a Buddhist; is that correct?

"A. Yes.

"Q. And Buddhists, they have an absolute reverence for human life; is that correct?

"A. Yes.

"Q. And you did your best to teach your family, your children, the absolute re[v]erence for human life that you had; is that correct?

"A.  Yes.

"Q.  Now, you want your children to do the right thing; don't you?

"A.  Yes, I want them to walk on the right path and also support themsel[ves].

"Q.  And you've done the best you can to help get to that point?

"A.  Yes.

"[Prosecutor]:  I have no further questions."

In context, it appears that the prosecutor's cross-examination and subsequent argument on Buddhism was not about racial animus but instead that he was making the point that despite Chhuon's difficult childhood, Marith did his best to raise Chhuon and that none of Marith's other children turned out the way Chhuon did.  Looking at the entire line of questioning around this statement, which the dissent does not endeavor to do, it is clear the prosecutor was seeking to ask a variation on the same, non-raced-based theme: that the father did the "best you can to provide for your family," "taught your children the difference between right and wrong," taught them to "have an absolute reverence for human life," that you "want your children to do the right thing," and that "you've done the best you can to help get to that point."  For these reasons, we do not find on this record that the prosecutor's argument used racially discriminatory language or otherwise exhibited bias or animus towards Chhuon because of his race, ethnicity, or national origin.  (See § 745, subd. (a)(1), (2).)

#### *4. Motive for the Sacramento Robbery*

Chhuon claims that the "prosecutor's embrace of the perpetual foreigner stereotype led him to impute an ethnic-based motive for the Sacramento robbery" when the prosecutor argued: "[Chhuon] was targeting someone to rob. Who? An Asian family. They are not going to report it to the police. There is a cultural barrier. . . . They may have some mistrust of the police. They may have a language problem with the police, and they are not going to report these kinds of things."

We find that the prosecutor's argument about who Chhuon was targeting to rob did not violate the RJA in this case. As discussed above, the RJA's relevant provisions do not encompass bias or animus directed towards persons other than the defendant or racially discriminatory language about persons other than the defendant. Here, we conclude that the prosecutor's argument regarding "[a]n Asian family" did not exhibit bias or animus "towards [Chhuon] because of [his] race, ethnicity, or national origin" or use racially discriminatory language "about [Chhuon's] race, ethnicity, or national origin." (§ 745, subd. (a)(1), (2).) The prosecutor's argument did not pertain to Chhuon or refer to his race, ethnicity, or national origin. To the extent it exhibited bias or animus or used racially discriminatory language, it was directed towards the "Asian family" targeted by Chhuon (the victims), not towards Chhuon (the defendant).

That said, we acknowledge Chhuon's related argument that the prosecutor's argument might have appealed to racial bias by imputing to Chhuon a race-based motivation in selecting his victims and by relying on stereotypes about Asian families when Chhuon, too, is Asian. Nevertheless, even if we conclude

that the prosecutor's argument violated the RJA, we conclude beyond a reasonable doubt that the violation did not contribute to the judgment. Here, the prosecutor's argument was brief. It primarily regarded the asserted characteristics of the victims, not the perpetrators, and thereby did not create a reasonable possibility of racial bias directed against Chhuon. And to the extent the argument reflected negatively on Chhuon for assertedly selecting victims based on racially biased stereotypes, that negative reflection pales in comparison to the murders themselves, during which Chhuon entered the Le family apartment, shot Luu in her hip, shot and killed Nghiep with a gunshot wound to his head, and shot and killed Hung with a gunshot wound to his chest.

### 5. Trope of "Female Asian American Meekness"

Chhuon claims that the prosecutor invoked a gendered "trope of female Asian American meekness" — in contrast to Chhuon — including when the prosecutor described Southeast Asian American witnesses as "soft-spoken," asked them to speak more loudly, and told them not to be "self-conscious" about speaking more loudly.

As a preliminary matter, the RJA's relevant provision only prohibits the use of "racially discriminatory language *about the defendant's race*, ethnicity, or national origin, or otherwise exhibited bias or animus *towards the defendant because of the defendant's race,* ethnicity, or national origin, whether or not purposeful." (§ 745, subd. (a)(2), italics added.) Further, the record shows that the prosecutor asked numerous witness — including but not limited to Asian American women — to speak more loudly. For example, the prosecutor greeted Evans, "Good morning, Mr. Evans. I know you are soft-spoken. You are going

to have to keep your voice up for us today, okay." The prosecutor also told Chhinkhathork, "Try to keep your voice up as loud as you can, sir. I know you're soft spoken." In addition, the record shows that the trial court repeatedly asked witnesses to pull the microphone up to them and speak loudly into it. The trial court requested from Chhinkhathork, "Let me ask you to get a little closer to that microphone again." The trial court asked another witness, "can I ask you to pull that microphone up and speak loudly into it?" The trial court told yet another witness, "Before you answer that, pull that microphone up and use it." On this record, we decline to conclude that the prosecutor's requests to Southeast Asian American witnesses to speak more loudly or accompanying comments that they were soft spoken or should not feel self-conscious about speaking more loudly, exhibited bias or animus toward Chhuon because of his race, ethnicity, or national origin. (See § 745, subd. (a)(2).) Nor do we find any such bias or animus towards Chhuon based on the prosecutor's asserted reliance on "the trope of female Asian American meekness" by asking the witness Champa Onkhamdy about her relationship with Chhuon or her pregnancy with his child.

### 6. Model Minority Myth

Chhuon claims that the prosecutor invoked the "model minority myth" by framing — in Chhuon's appellate counsel's words — some witnesses as " 'good' immigrants" and contrasting them to Chhuon, a "deviant minority." In support of his claim, Chhuon details testimony and argument reflecting positive attributes for Avina and Huerta, who were the victims of the Pomona shooting, the social worker Kanly, whose testimony was read into the record as discussed above, and also Chhuon's family members. Chhuon then details testimony describing the suspect (i.e. Chhuon) as having dark skin and argument

describing Chhuon as having squandered the opportunities that he had been given. Chhuon further points to the prosecutor questioning a psychiatrist about whether it was "very rare for [refugees from Cambodia] as they grew up to become lawbreakers."

However, contrary to Chhuon's claim, the prosecutor could permissibly note positive attributes of victims and witnesses. The prosecutor could present positive characteristics of the victims as part of the prosecution's victim impact evidence. (See *People v. Winbush* (2017) 2 Cal.5th 402, 465.) For example, the prosecutor could question Avina's family members about Avina coming to the United States in search of the American dream, about a college scholarship Avina had received, about the jobs Avina worked, and that Avina sent most of the money he earned to support his family back in Mexico. The prosecutor could also compare the victims, such as Avina and Huerta, to Chhuon and suggest that Chhuon made poor choices with the opportunities he had. (Cf. *People v. Williams*, *supra*, 61 Cal.4th at p. 1286 ["The contrast the prosecutor drew between the victim's positive effect on the lives she touched and defendant's violent crimes was reasonable commentary on the weighing of aggravating and mitigating circumstances and fell within the wide range of permissible argument"].)

Chhuon further argues that the prosecutor presented him, in appellate counsel's words, as a "deviant minority" by juxtaposing him against the social worker Kanly. As detailed above, Kanly's testimony from a prior proceeding was read in full to the jury at the defense's request and over the prosecutor's objection. In that testimony, Kanly chronicled his experiences of surviving the tremendous hardship of life under the Khmer Rouge and later of helping Cambodian refugees in America.

Here, the prosecutor could properly comment on Kanly's testimony that he had assisted thousands of people and none of them (aside from Chhuon) had become murderers, as part of the prosecutor's broader argument that Chhuon's childhood experiences did not justify or otherwise explain his later crimes.

Chhuon also claims the prosecutor's question violated the RJA when he asked about whether "it was very rare for [Cambodian refugees] as they grew up to become lawbreakers in this country." Chhuon's argument here is somewhat hard to understand, but it appears to be that because "Southeast Asians are disproportionately represented in the criminal legal system," any suggestion to the contrary is suggestive of bias or animus towards Chhuon. The psychiatrist, however, was clear in his response to the question about the limitations of his studies on the topic. Specifically, he responded to the prosecutor's question by explaining that "my study was limited to two communities, much different from the California community. I can't say I can speak for all Cambodians in the United States. All I can speak for is these two groups that I studied. [¶] In those groups I didn't find any major tendencies to this kind of crime." The prosecutor could also ask the psychiatrist, who had conducted research involving Cambodian youth refugees from the Pol Pot era, this question again as part of the prosecution's broader argument that Chhuon's childhood experiences did not justify or otherwise explain his later crimes.

Chhuon additionally argues that the prosecutor used Chhuon's family against him by presenting them, in appellate counsel's words, as "good" immigrants who survived Cambodia and thrived in the United States. However, the prosecutor could present testimony and argument regarding Chhuon's siblings' lives to show that while Chhuon's siblings (and Chhuon)

experienced difficulties, they did not justify or explain Chhuon's subsequent crimes, since Chhuon's siblings, who encountered similar difficulties, did not commit similar crimes. In this vein, the prosecutor could question Chhuon's family members about being "able to put a life together . . . here in America," about how "you've lived as best you could a productive life, and you haven't broken the law," and about how Chhuon's siblings were working hard, raising families, or going to school. The prosecutor could also argue that Chhuon's older brother "was able to put himself together and lead a right life, and he knew the difference between right and wrong, and he knew you did not go around doing that kind of thing." To the extent the prosecutor made comparisons between Chhuon and other witnesses and his family, they did not exhibit bias or animus toward Chhuon because of his race, ethnicity, or national origin. (See § 745, subd. (a).) While the use of racial stereotypes does not require stating the name of the stereotype, the prosecutor notably never referred to "model" or "deviant" immigrants here.

Chhuon further claims that a photographic exhibit depicting Chhuon with, as his trial counsel argued, a "substantially darker complexion than he, in fact, had" primed the jury to negative racial stereotypes, particularly when combined with eyewitness testimony in which the suspect (i.e. Chhuon) was described as dark-skinned. The exhibit in question was a blown-up polaroid style photograph depicting Chhuon. Furthermore, during trial, a victim for the Sacramento crimes testified remembering that the suspect for those crimes had "dark skin, the face dark." Another eyewitness testified that the shooter for the Pomona crimes had "a Black arm" and that the shooter's arm was "dark, but it was not very dark." However, the prosecutor could elicit testimony describing the

suspect's skin color.  There is no RJA violation "if the person speaking is giving a racially neutral and unbiased physical description of the suspect." (See § 745, subd. (a)(2).)  In addition, contrary to Chhuon's claim that the photographic exhibit portrayed him with a darker complexion and thereby "primed the jury to perceive [him] as proximate to Blackness and thus to accept the negative, Black-coded stereotypes promulgated by the prosecutor," the prosecutor could present this photographic exhibit without running afoul of the RJA.  Upon the defense's objection, outside of the presence of the jury, the prosecutor acknowledged that "because of the coloring in [that exhibit] Mr. [Chhuon] does look somewhat darker" but explained that the photograph was taken closer in time to the crimes than other photographs and Chhuon's appearance had changed while in jail for a considerable period of time.  The trial court ordered the prosecutor to not argue "that the photograph shows [Chhuon's] color of skin," but the court admitted the photograph because "there is some evidentiary value in the fact it is dated as the booking photograph on August 16th."  In these circumstances, the prosecutor did not exhibit bias or animus by displaying that exhibit, particularly when Sergeant Risedorph testified that the exhibit depicted Chhuon as he appeared around the time of the crimes.

### 7. *Alleged Genocide Denialism*

Chhuon claims that the prosecutor engaged in genocide denialism by objecting to the 15-minute video compilation showing the atrocities in Cambodia and by later arguing that the defense embellished or failed to prove facts regarding it. Chhuon further claims that the trial court also engaged in genocide denialism by injecting its personal views on the

genocide and instructing the jury to disregard portions of the video's audio.

Chhuon focuses much of his argument on a discussion outside of the presence of the jury regarding whether to admit the 15-minute video described above regarding the Cambodian genocide. In that discussion, the prosecution argued that it did not have adequate information regarding when or where images in the video were taken and lacked the foundation, or could not authenticate, various images or statistics referenced in the video. For example, the prosecutor argued, among other things, that it did not know when images in the video, such as images of skulls, were taken, and it lacked foundation or authentication for various images and statistics, such as whether the bombing scenes took place in Cambodia, whether children were dragged from their hospital beds, or how many people were missing or died.

The trial court, however, "accept[ed] the visual images" in the video; "accept[ed] that things were very bad in Cambodia"; and "accept[ed]" the defense's representations that they would lay a foundation through testimony by Chhuon's family members. The court expressed concern though about the "political nature" of the video's audio commentary criticizing Richard Nixon and Henry Kissinger and stated that it did not "want to get into the Vietnam War" because doing so was unnecessary here. The defense then represented that the "political rhetoric" had been edited out of a condensed 15-minute version of the video and that "[f]or each portion that we have edited into this new 15-minute video, I intend to lay a foundation, authenticate through the mother, the father, and brother every scene in there I can authenticate." Accordingly, the court admitted the 15-minute video with its audio

commentary but explained to the jury that some of its audio portions were "argumentative and without foundation," such as "[t]hings like human hemorrhage" in reference to mass dislocation, whether the word "sleep" was banned by the Khmer Rouge, and how many children disappeared. The court instructed the jury, "You may consider the audio portion when it is descriptive as to what the video is showing. [¶] Otherwise, you should disregard the statement." As described above, the 15-minute video depicted stacked bones and skulls, mass graves with dead bodies, and bombs exploding. The video narrates how dying children were carried off in plastic bags and the old and crippled were dumped on the side of the road. The narration states that the price of a Cambodian life was $100 and that the war caused a million dead and wounded. The narrator described a camp in Cambodia where 12,000 people died as the "Asian Auschwitz" and described people being tortured, hanged, drowned, disemboweled, and electrocuted. The video extensively depicted starving children and ends with several minutes of video on the stark conditions of a refugee camp in Thailand.

Assuming that genocide denialism could constitute bias or animus in some circumstances, we conclude that no such genocide denialism occurred here: the prosecutor's arguments and the trial court's rulings did not deny the genocide but rather addressed standard evidentiary issues of foundation, authentication, and relevance. Concerns, for example, about playing commentary to the jury regarding Richard Nixon and Henry Kissinger's political policies are standard evidentiary concerns that do not evidence racial bias. By objecting to the contents of the video regarding the genocide, the prosecutor did not exhibit bias or animus toward Chhuon because of his race,

ethnicity, or national origin. Further, we conclude that the prosecutor did not exhibit such bias or animus toward Chhuon by subsequently arguing to the jury in closing argument that the defense "embellish[ed]" the facts when the defense said that Chhuon "saw death by torture . . . every day ever [in] his life from the age of 3 until 8" or failed to prove that from 1975 to 1979, "25 percent of the Cambodian population was eradicated." The prosecutor did not deny the genocide and, to the contrary, acknowledged the horrendous conditions during Chhuon's childhood. For example, the prosecutor acknowledged in closing argument, "I am not ever going to say that Mr. [Chhuon] did not have a horrendous childhood"; "I did not in [any] way, shape or form disagree that Mr. [Chhuon] went through some terrible experiences"; and "I am not going to stand here and tell you that Mr. [Chhuon] had an easy life when he was very young."

Similarly, we conclude that the trial court did not exhibit such bias or animus toward Chhuon by admitting the video but instructing the jury to disregard certain portions of the video's audio commentary because the court determined certain portions were "argumentative and without foundation." Those rulings did not deny the genocide but rather addressed standard evidentiary issues and fell within the court's discretion. (Cf. *People v. Monterroso* (2004) 34 Cal.4th 743, 779–780.) Moreover, the court did not deny the genocide but rather, admitted extensive testimony regarding the impoverished and violent conditions under the Khmer Rouge, including testimony that the Khmer Rouge separated the children from their parents and Chhuon was malnourished and forced to bury those the soldiers had killed. Indeed, this court has reviewed the video that was played to the jury, and the trial court permitted the

jury to see incredibly graphic, detailed, and disturbing images regarding the Khmer Rouge.

### 8. *Alleged Racially Discriminatory Language*

#### a. *Prosecutor's language*

Chhuon claims that during the penalty phase closing argument the prosecutor used racially discriminatory language when the prosecutor referred to Chhuon and other TRG members as "predators," "hunt[ing]" victims, and "kill[ing] them like dogs in the middle of the street." (See § 745, subd. (h)(4) [racially discriminatory language includes "language that compares the defendant to an animal"].) Chhuon also claims that the prosecutor characterized him as "something subhuman following its natural impulses" by arguing that he was "eating on the run, stopping for a hotel room here or there, gas. That was his lifestyle, and steal along the way. And that is what he does. *That is what he is*." Chhuon adds, more generally, that the prosecutor engaged in a "racialized gang narrative," dehumanized him by "invoking racialized gang member stereotypes," and "situat[ed]" him "within the historically racist superpredator myth."

By characterizing Chhuon as a predator, the prosecutor spoke of Chhuon's dangerousness and disputed the import of the defense's penalty phase case focusing on Chhuon's difficult childhood and upbringing. The prosecutor argued in the penalty phase closing argument in relevant part, that "Mr. Chh[uon] and his fellow TRG's were predators, pure and simple. This has nothing to do with his childhood. It has nothing to do with any learning disability, has nothing to do with any frontal lobe damage. [¶] It has to do with the simple fact it's as one of the doctors said, antisocial personality. He doesn't want to conform

to the rules of society." "He's a killer, and he's a robber. . . . He's down for TRG. That is his life. [¶] And you are never going to change that. That is Mr. Chh[uo]n." Viewing the prosecutor's remarks in their context, we conclude that the prosecutor simply argued that, based on the evidence, Chhuon had "robb[ed]" and "kill[ed]" others, had loyalty to his gang, and continued to pose a threat to others. The prosecutor did not compare Chhuon to an animal. While the term "predator" can refer to animal behavior, it also can refer to human behavior. (See Merriam-Webster Dict. Online (2024) <https://www.merriam-webster.com/dictionary/predator> [as of June 1, 2026] [predator means (1) "an organism that primarily obtains food by the killing and consuming of other organisms: an organism that lives by predation . . . [¶] *especially*: an animal that preys on other animals" and (2) "one who injures or exploits others for personal gain or profit"]; all Internet citations in this opinion are archived by year, docket number, and case name at <http://www.courts.ca.gov/38324.htm>.) Indeed, California law includes a statutory scheme expressly concerning "[s]exually [v]iolent [*p*]*redators*." (Stats. 1995, ch. 763, § 3, italics added.) That code provision pertains to human, not animal, behavior, and defines terms such as "[p]redatory" to mean "an act is directed toward a stranger, a person of casual acquaintance with whom no substantial relationship exists, or an individual with whom a relationship has been established or promoted for the primary purpose of victimization." (Welf. & Inst. Code, § 6600, subd. (e).) Read in context, the prosecutor's use of the word "predator" was used in a similar fashion. Thus, we find no RJA violation here. (See *People v. Quintero* (2024) 107 Cal.App.5th

1060, 1078 [the prosecutor's use of the terms " 'predator' " and " 'prey' " did not violate the RJA].)[12]

Chhuon also claims that the prosecutor used dehumanizing, animalistic language when the prosecutor argued during the penalty phase closing argument that Chhuon and his accomplices "knew nothing about [Mr. Avina] at all. They didn't even take the time to find out. But simply because they saw them, Hispanics in a Hispanic neighborhood, one has a .22, they've got to be gang members. [¶] And they decide, they decide to hunt him down and kill them like dogs in the middle of the street." Here, however, the prosecutor was speaking of the manner in which Chhuon and Pan — suddenly and without provocation — shot at Avina and Huerta. In other words, the prosecutor's reference to "hunt[ing]" did not compare Chhuon to an animal but rather described the manner in which Chhuon and Pan shot at Avina and Huerta. And indeed, "hunt[ing]" can refer to human behavior. (See Merriam-Webster Dict. Online

---

[12] Chhuon also argues that amendments in Assembly Bill No. 1071 make clear that the prosecutor's language in this case violated the RJA. He cites a list contained in the uncodified findings of Assembly Bill No. 1071 of "dehumanizing and othering language," which includes " 'predator,' " " 'uncivilized,' " "gratuitous references to nationality, race, or immigration status," and "gratuitous references to gangs, tattoos, nicknames, or neighborhoods." (Stats. 2025, ch. 721, § 1, subd. (c).) The uncodified findings that Chhuon relies upon though for this list pertain to the "low threshold required to establish a prima facie showing," which is not at issue on this appeal. (*Ibid*.) Furthermore, while uncodified legislative findings may be used as an aid in construing a statute, they " ' "do not confer power, determine rights, or enlarge the scope of a measure." ' " (*Doe v. Superior Court* (2023) 15 Cal.5th 40, 69.)

(2024) <https://www.merriam-webster.com/dictionary/hunt> [as of June 1, 2026] [hunt means, among other things, to pursue for food or in sport; to pursue with intent to capture; or to search out].) In addition, the prosecutor's description of shooting Avina and Huerta "like dogs in the middle of the street" did not compare Chhuon to an animal but rather reflected Chhuon's disregard for the humanity of his victims. Thus, we conclude that, in context, the prosecutor's reference to "hunt[ing]" or "kill[ing] them like dogs" did not constitute racially discriminatory language.

Nor did the prosecutor characterize Chhuon as "something subhuman" by arguing that he was "eating on the run, stopping for a hotel room here or there, gas. That was his lifestyle, and steal along the way. And that is what he does. *That is what he is*." The prosecutor's remarks fell within the prosecutor's broader argument that — based on the evidence — Chhuon "cared about himself, and doing what he wanted to do"; that there was "nothing in that that warrants any type of sympathy, any type of mercy"; and that he is a killer and a robber and "[t]hat's what he is." On this record, we do not find the prosecutor's remarks to use racially discriminatory language about Chhuon's race, ethnicity, or national origin or otherwise exhibit bias or animus towards Chhuon because of his race, ethnicity, or national origin. (§ 745, subd. (a)(1), (2).)

Lastly, contrary to Chhuon's claim, we do not find the prosecutor to have invoked "racialized" gang narratives or stereotypes or to have situated Chhuon within the "historically racist superpredator myth." Chhuon argues that in the decade leading up to his trial, fear of non-White teenage superpredators spread through media crime stories and, as a result, the superpredator myth affected the way that law enforcement,

courts, and the public saw youth of color. (See *People v. Hardin* (2024) 15 Cal.5th 834, 905 (dis. opn. of Evans, J.) ["The superpredator myth is one of many incarnations of racism that have plagued our criminal and juvenile justice systems since their inception"].) However, for the reasons previously discussed, the gang evidence in this case was relevant and not unduly inflammatory. The prosecutor did not use racially discriminatory language or otherwise exhibit bias or animus towards Chhuon because of his race, ethnicity, or national origin by relying on Chhuon's gang membership for purposes of establishing that Chhuon and Pan, together, were involved in the Pomona crimes and for purposes of establishing their motive for those crimes. In addition, the prosecutor never used the term "superpredator." Nor, for the reasons previously discussed, did the prosecutor's lone reference to "predator," in context, constitute racially discriminatory language or otherwise exhibit bias or animus towards Chhuon because of his race, ethnicity, or national origin. (§ 745, subd. (a)(1), (2); *Bankston*, *supra*, __ Cal.5th at p. __ [p. 102] ["we must carefully consider context when determining whether particular statements violate the RJA"].) Rather, the prosecutor's arguments sought to convince the jury that, based on the evidence presented, the aggravating circumstances substantially outweighed the mitigating circumstances and thus warranted a death sentence. (See § 190.3.)

### b. *Chhuon's defense counsel's language*

Chhuon also claims that defense counsel used racially discriminatory language when arguing, "Here [Chhuon] was[,] a child from the jungle and placed into an elementary school that had no means to assimilate these children into our American society."

Defense counsel made this remark during opening statements in the penalty phase.  Defense counsel explained that Chhuon grew up in Cambodia, but when Chhuon was three years old, the Khmer Rouge took over and employed cruel and violent tactics.  Chhuon's family eventually left to Thailand and later relocated to Mobile, Alabama.  Defense counsel continued to explain, "They were transplanted from the war zone in the refugee camps into another war zone, one of the worst neighborhoods that America had to offer.  Even back then in 1981 there were bullets flying in their neighborhood."  Chhuon "would go to school where he couldn't speak the language.  Couldn't read. . . .  They didn't have English as a second language, culture sensitive programs."  "[Chhuon] would just sit in class, the evidence will show, and he wouldn't be disruptive, but he really had trouble participating.  Here he was a child from the jungle and placed into an elementary school that had no means to assimilate these children into our American society."  "[H]e was learning . . . the English language but he had no support from his family, had no support at school.  He was alone."

Defense counsel's reference to Chhuon being "from the jungle" causes some concern.  (See § 745, subd. (h)(4) [racially discriminatory language includes "language that compares the defendant to an animal"].)  Nevertheless, we conclude that defense counsel's reference did not violate the RJA.  Significantly, defense counsel did not compare Chhuon to an animal; rather, defense counsel referred to Chhuon as a "child."  And while referring to a defendant as "from the jungle" might in some circumstances appeal to racial bias, we conclude that an objective observer would not understand it to do so here.  Here, defense counsel referred to Chhuon as a "child" and spoke of "the

jungle" in the context of seeking sympathy for him and emphasizing the differences between his experience in Cambodia and his experience in the United States. Defense counsel explained that when Chhuon went to school in the United States, he "couldn't speak the language" and "[c]ouldn't read," he had "trouble participating" in class, and the school lacked programs to support him in this difficult transition. In this context, defense counsel's remarks sought to humanize him; establish mitigating circumstances that extenuated the gravity of the crimes; and ultimately convince the jury that the aggravating circumstances did not substantially outweigh the mitigating circumstances and accordingly that the jury should spare his life. (See § 190.3.)

This is also different than the context presented in *Bankston*. (See *Bankston*, *supra*, __ Cal.5th at p. __ [p. 102] ["we must carefully consider context when determining whether particular statements violate the RJA"].) In *Bankston*, we accepted the Attorney General's concession that the prosecutor's penalty phase arguments violated the RJA. (*Bankston*, at p. __ [p. 105].) In that case, the prosecutor embellished upon the comparison of the defendant to a Bengal tiger "by describing the tiger as 'enormous,' with his 'muscles all flexed out,' 'claws out,' 'fangs' visible, and growling, and placed the tiger deep in the 'jungle[].' " (*Id.* at p. __ [p. 106].) *Bankston* explains that the prosecutor's embellishments "evoked a well-known history of the use of language demeaning Black individuals through comparisons to hyperpredatory 'jungle' animals, which is the very history the Legislature referenced in the uncodified findings explaining the intended reach of section 745, subdivision (a)." (*Ibid.*) Indeed, the very purpose of the prosecutor's use of this imagery was to convince the jury to show

no mercy for defendant.  Conversely, here, the defense counsel spoke of "the jungle" for the opposite purpose, i.e., to convince the jury to show mercy for defendant, as literally part of a plea to spare his client's life.  The terminology, though poorly worded, was used in the context of seeking sympathy for Chhuon and to explain cultural differences between Cambodia and the United States.  The different context between these two cases leads us to believe that the defense counsel's reference to Chhuon in this case being "from the jungle" did not violate the RJA. Furthermore, while not necessary in order to resolve the issue here, future cases may need to weigh whether comments made by a defendant's own counsel as part of zealously advocating for a client raise different considerations that did not apply to other courtroom participants, such as prosecutors and trial judges. Future cases may also need to consider an additional issue not raised here: whether when a claim based upon defense counsel's own remarks raises concerns about counsel purposefully creating reversable error for the benefit of one's own client.

### 9. *Remedy*

For the reasons discussed above, we conclude that there was no prejudicial violation of the RJA.  We reject Chhuon's arguments and see no reason to reach a different conclusion as to Pan's trial.  We reach the same conclusion when we consider Chhuon RJA arguments cumulatively.  We thus see no basis to reverse Chhuon's convictions or sentence.

In supplemental briefing, Chhuon originally asked that, if we reach this conclusion, we remand this case to the superior court to allow him to file a motion raising his existing RJA claims described above together with new additional RJA claims (that the existing claims tend to corroborate).  He explains that

additional RJA claims require further investigation and includes, as examples of further investigation: (1) potential charging or sentencing disparities for Southeast Asian Americans and/or Cambodian Americans, and (2) the trial judge's alleged use of biased language in a published book. He does not make explicit whether he would like us to stay this appeal in order to do so. However, at oral argument, counsel for Chhuon acknowledged that, in light of our intervening decision *People v. Wilson*, *supra*, 16 Cal.5th at page 874, remand is not necessary for further factual development of the claims on appeal. As counsel noted, further factual development is not necessary for the claims on appeal here, which are based upon the transcript, where we have the context, and the parties agree upon the shared history. Thus, because Chhuon seeks to adjudicate additional claims under the RJA that are not intertwined with the issues on appeal, "he 'does not need a stay of the appeal or a remand to the superior court to raise [the RJA claim]' in a petition for writ of habeas corpus." (*People v. Frazier* (2024) 16 Cal.5th 814, 822, fn. 3.) In addition, Chhuon " 'is represented by the Office of the State Public Defender (OSPD)' [citation], and [he] 'has not shown that OSPD would be unavailable to litigate his claim [] if [it was] to be raised instead through a limited-purpose habeas petition addressed exclusively to [that claim].' " (*Ibid.*)

Accordingly, we deny Chhuon's request to remand this case to the superior court without prejudice to him filing a petition for writ of habeas corpus raising an RJA claim. (See *People v. Frazier*, *supra*, 16 Cal.5th at p. 822, fn. 3.) "[W]e note that the analysis will likely be different in cases unlike this one, in which the RJA claims are intertwined with issues on appeal. . . . The analysis may also be different in noncapital

cases in which the claimed RJA violations carry the possibility of release, and cases in which delay may jeopardize the preservation of evidence needed to make out an RJA violation." (*People v. Wilson, supra,* 16 Cal.5th at p. 962, fn. 23.)

## V. CUMULATIVE ERROR

Chhuon claims that the cumulative effect of the errors in the guilt and penalty phases violated his state and federal constitutional rights to a fair trial, due process, and a reliable determination of guilt and penalty. Pan likewise claims that the cumulative effect of the errors requires reversal of his judgment. We have concluded that defense counsel violated Pan's right to decide the objective of his defense, and for this reason, we reverse his judgment in its entirety. As to Chhuon, we vacate the true finding on his gang enhancement. Otherwise, where we have concluded there was error or assumed there was error, we have also concluded there was no prejudice in either the guilt or penalty phase. We also conclude that the cumulative effect of the actual or assumed errors does not warrant reversal of Chhuon's judgment. (See *Covarrubias, supra,* 1 Cal.5th at p. 934; *People v. Jennings* (2010) 50 Cal.4th 616, 691.)

## VI. DISPOSITION

We vacate the true finding on Chhuon's gang enhancement and remand his case to the trial court for any retrial of the same. We otherwise affirm Chhuon's judgment.

We reverse Pan's judgment in its entirety and remand his case to the trial court for further proceedings.

**GROBAN, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**KRUGER, J.**

PEOPLE v. CHHUON and PAN

S105403


Concurring and Dissenting Opinion by Justice Liu


The California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317) prohibits the use of racial stereotypes and language that "explicitly or implicitly appeals to racial bias." (Pen. Code, § 745, subd. (h)(4); all statutory references are to this code.) This prohibition extends to "language that references the defendant's . . . culture, ethnicity, or national origin." (*Ibid.*) Throughout defendant Run Peter Chhuon's trial, the prosecutor invoked cultural scripts to set the jury's expectations for how Cambodian immigrants should behave and then leveraged those stereotypes to cast Chhuon as deviant for failing to conform to expectations associated with his ethnicity. The prosecutor emphasized Chhuon's failure to strive for the American Dream, to live up to a variation of the model minority myth, and to adhere to religious beliefs often associated with Cambodians. There were plenty of ways for the prosecutor to argue that Chhuon showed disrespect for the law and human life without gratuitous references to Chhuon's culture, ethnicity, and national origin. Those references constitute a form of discrimination prohibited by the RJA, and the violation here requires reversal of Chhuon's death judgment.

I.

The Legislature enacted the RJA "to eliminate racial bias from California's criminal justice system" because "racism in any form or amount, at any stage of a criminal trial, is

1

intolerable." (Stats. 2020, ch. 317, § 2, subd. (i).) Racial bias "undermines public confidence in the fairness of the state's system of justice and deprives Californians of equal justice under law." (*Id.*, subd. (a).) In enacting the statute, the Legislature observed that "[e]ven though racial bias is widely acknowledged as intolerable in our criminal justice system, it nevertheless persists because courts generally only address racial bias in its most extreme and blatant forms." (*Id.*, subd. (c); see *People v. Wilson* (2024) 16 Cal.5th 874, 963 (dis. opn. of Evans, J.) ["A central reason the Legislature enacted the RJA was that '[c]urrent law, as interpreted by the courts, stands in sharp contrast to [the] Legislature's commitment to "ameliorate bias-based injustice in the courtroom" ' with '[c]urrent legal precedent often result[ing] in courts sanctioning racism in criminal trials.' "].) The Legislature criticized "[e]xisting precedent" as "insufficient to address discrimination in our justice system." (Stats. 2020, ch. 317, § 2, subds. (c), (f).) It is because courts and case law had inadequately addressed racial discrimination that the Legislature enacted the RJA to "ensure that race plays no role at all in seeking or obtaining convictions or in sentencing." (*Id.*, subd. (i).)

To achieve this goal, the Legislature prohibited the use of language that "explicitly or implicitly appeals to racial bias" (§ 745, subd. (h)(4)), regardless of whether that appeal was "purposeful" (*id.*, subd. (a)(2)). That is, the RJA prohibits language that appeals to racial bias whether or not the speaker intended to do so. This marks a major shift in the law. (See *People v. Bankston* (June 1, 2026, S044739) __ Cal.5th __, __ [p. 4] (conc. opn. of Liu, J.) ["a momentous change effected by the RJA is the rejection of discriminatory purpose or intent as the touchstone of unlawful bias"].) For decades, unlawful

2

discrimination in the criminal justice system has been understood to mean "purposeful" or "intentional" discrimination. (See, e.g., *McCleskey v. Kemp* (1987) 481 U.S. 279, 292; *Batson v. Kentucky* (1986) 476 U.S. 79, 93 ["the 'invidious quality' of governmental action claimed to be racially discriminatory 'must ultimately be traced to a racially discriminatory purpose' "]; *Baluyut v. Superior Court* (1996) 12 Cal.4th 826, 833 [to prove discriminatory prosecution, "[t]here must be discrimination and that discrimination must be intentional and unjustified and thus 'invidious' because it is unrelated to legitimate law enforcement objectives"].) Such purposeful discrimination is now less commonplace and, in any event, exceedingly difficult to prove. With the enactment of the RJA, an appeal to racial bias, whether explicit or implicit, need not be intentional to be unlawful.

## II.

In this case, the prosecution cast Chhuon in a negative light by expressly referencing his culture, ethnicity, and national origin. This trial strategy was, whether purposeful or not, an appeal to racial bias within the meaning of the RJA. (§ 745, subd. (h)(4).) These improper references included asking Chhuon's brother, "This country, they brought you here free of charge? You didn't pay to come to this country, did you?"; commenting that "Buddhists, they have an absolute reverence for human life; is that correct?" and "One of the reasons that you Cambodian people have been such a wonderful people is their dedication to Buddhism?"; and suggesting that Chhuon's conduct betrayed his Cambodian identity and the tenets of Buddhism taught to him by his father. Today's opinion repeatedly states that language used at trial must be read in context. (See maj. opn., *ante*, at pp. 108, 113.) No one disagrees.

But the pages of context recited by the court at most suggest that the prosecutor at Chhuon's trial may not have harbored discriminatory intent. Context does not cleanse the statements at issue of their power to appeal to racial bias.

To set the stage for the prosecution's narrative that Chhuon defied the *good* Cambodian immigrant stereotype, the prosecutor drew the jury's attention to the foreignness of certain witnesses by declining to address them by their names based on his asserted inability to pronounce them. The prosecution introduced Bunjun Chhinkhathork, a fellow Tiny Rascals Gang member, to the jury as follows: "[W]e will present at least one accomplice to this particular crime. And I am not going to try to pronounce his name for you because I always mispronounce it. But his moniker, his street name is Puppet." At the same time, the prosecutor had no trouble using the full names of the victims — Quyen Luu, Hung Dieu Le, Nghiep Le, Amie Le, Vincent Le, Rodolfo Huerta, and Miguel Avina. The prosecutor referred to them as "Miss Luu," "Mr. Huerta," "Mr. Avina," and so forth throughout the trial.

Referring to gang members by their gang nicknames does not alone violate the RJA. (Cf. maj. opn., *ante*, pp. 79–81.) But here the prosecutor claimed he could not pronounce their names, even as he consistently used the full names of the victims and other witnesses. For Asians and Asian Americans, a speaker's refusal to use a person's name because it appears hard to pronounce is a commonplace occurrence that, whether intentionally or not, signals cultural disrespect and casts the person as a foreigner and not a member of the relevant community. (E.g., Huang, *My name is hard for Americans to pronounce. Don't tell me to change it*, Washington Post (June 8, 2021).) (When the pronunciation of a name is not readily

4

apparent, a simple solution is to ask.) By contrast, the prosecutor's use of the victims' and witnesses' full names invited the jury to view them as dutiful adherents to the cultural scripts assigned to them in the dominant culture.

The prosecutor built on this rhetorical division by casting the victims as *good* immigrants and setting the jury's expectations for how Cambodian immigrants like Chhuon should behave. The most glaring appeal in this vein was the prosecutor's suggestion that because Chhuon was Cambodian, he was expected to adhere to the tenets of Buddhism. Specifically, the prosecutor called on "racialized notions of Asianness and Asian religiosity" to suggest that Chhuon was particularly blameworthy because his conduct betrayed religious beliefs associated with Cambodians. (Iwamura, Virtual Orientalism: Asian Religions and American Popular Culture (2011) p. 5; *id.* at pp. 8–9 ["The Oriental Monk constitutes an American stereotype — one that must be placed alongside such easily recognizable figures as the inscrutable Oriental, evil Fu Manchus, Yellow Peril . . . and the model minority."].)

During the penalty phase, the prosecutor asked Chhuon's father, Marith Chhuon (misspelled in the record as "Mraith," as noted in counsel's briefing), if he was Buddhist. When he said he was, the prosecutor asked, "And Buddhists, they have an absolute reverence for human life; is that correct?" The prosecutor went on, "And you did your best to teach your family, your children, the absolute re[v]erence for human life that you had; is that correct?" Chhuon's father responded that he had.

If there had been evidence that Chhuon identifies as Buddhist or as an adherent of Buddhist values, then it might

5

have been appropriate for the prosecutor to show that Chhuon acted contrary to his professed values. But there is no evidence that Chhuon identifies as Buddhist or any evidence about his religious beliefs. There is also no evidence that Chhuon's father attempted to ensure his son would be Buddhist. To the extent the prosecutor was suggesting that Chhuon *should* have been Buddhist, it would constitute an improper appeal to a stereotype based on culture, ethnicity, or national origin, not to mention a disregard of Chhuon's freedom of religion. (See *Abington School Dist. v. Schempp* (1963) 374 U.S. 203, 220 [" 'neither a State nor the Federal Government can constitutionally force a person "to profess a belief or disbelief in any religion" ' "].) The prosecutor sought to link a belief in "reverence for human life" to Buddhism, but that belief is such a widely shared value that it is not clear what the linkage to Buddhism achieved — even when the entire line of questioning is considered — other than to cast Chhuon in a bad light against cultural, ethnic, or national origin stereotypes.

The court says the prosecutor "was making the point that despite Chhuon's difficult childhood, Marith did his best to raise Chhuon and that none of Marith's other children turned out the way Chhuon did." (Maj. opn., *ante*, at p. 96.) Even so, the prosecutor's questioning used "language that, to an objective observer, explicitly or implicitly appeals to racial bias." (§ 745, subd. (h)(4).) Both things can be true, and the RJA contains no exception for statements that have plausible non-racial meaning but also appeal to racial bias. (See *People v. Barrera* (June 1, 2026, S103358) __ Cal.5th __, __ [p. 3] (conc. opn. of Liu, J.) [language that activates *implicit* bias does so precisely "because the plausibly neutral meaning of the language is not its only meaning"]; cf. *id.* at p. __ [p. 85, fn. 11] (maj. opn.) ["language

can appeal to implicit racial bias even when the prosecutor purports to be giving a factual description of a brutal crime"].) Given the available evidence, the prosecutor had plenty of ways to argue that Chhuon showed disrespect for human life without arguing that Chhuon showed disrespect for Buddhism as well.

The narrative that a *good* Cambodian is a Buddhist Cambodian continued with the prosecutor's use of the testimony of Charleson Kanly, a Cambodian refugee and social worker who worked with Catholic Social Services to help Cambodian, Vietnamese, and Haitian families relocating to the United States. This testimony was elicited by the prosecution in an earlier proceeding and used by the prosecutor in Chhuon's trial during the penalty phase after being read into the record upon defense counsel's request. In the earlier proceeding, the prosecutor (different from the one at Chhuon's trial) asked Kanly: "One of the reasons that you Cambodian people have been such a wonderful people is their dedication to Buddhism?" and "In fact, it has been said that Cambodia was the most Buddhist country in Southeast Asia." The prosecutor continued: "[I]t was a huge part of life with the Cambodian people to believe in and practice Buddhist system, was it not?" and "In fact, one of the reasons the Khmer Rouge tried to wipe out Buddhism is because of the tremendous influence of the Buddhist monks had in the country; isn't that true?" The prosecutor added: "And they looked upon the Buddhist monks as people who had to be destroyed because they were against the communist ideas?" Kanly responded yes to these questions while saying that he didn't really know if it was "a huge part of life" but that he saw everybody around him practicing Buddhism. The prosecutor concluded by asking Kanly: "[O]ne of the major tenets, one of

7

the most important things about Buddhism is a reverence for all life?"

The prosecutor at Chhuon's trial objected to the admission of the testimony due to differences in style (saying, for example, that he wasn't as much "of a gentlem[a]n" as the other prosecutor and wouldn't say things like Kanly did "a wonderful job in helping others" and "a wonderful job keeping people off welfare") and asked the court to remove questions "going into Buddhism" because he "wouldn't ask those questions." But later in Chhuon's trial, the prosecutor pursued a similar theme in cross-examining the defense expert, Dr. William Sack, who had worked with youth who had survived the Khmer Rouge. The prosecutor asked: "Sir, would you agree that among the refugees from Cambodia[] that went through the [Khmer Rouge] regime . . . that it was very rare for those people as they grew up to become lawbreakers in this country?" Dr. Sack responded that he couldn't "speak for all Cambodians in the United States," but among the groups that he had studied, he "didn't find any major tendencies to this kind of crime."

The same theme extended into the penalty phase when the prosecutor read back selected portions of Kanly's testimony from the earlier proceeding. Today's opinion makes much of the fact that "it was defense counsel who sought to have [Kanly's] testimony admitted as mitigation evidence and the testimony was ultimately admitted over the objection of the prosecution." (Maj. opn., *ante*, at p. 89.) But the prosecutor, in his closing argument, proceeded to rely on that testimony to repeat the point that none of the other refugees Kanly had helped had become murderers. Further, the prosecutor read back Kanly's affirmative responses to the refrains that "one of the major tenets, one of the most important things about Buddhism is a

8

reverence for all life, isn't it?" and "It's abhorrent to kill anybody or anything?" The prosecutor then said to the jury in his summation that "the testimony of Mr. Kanly was testimony that assist[ed] the prosecution rather than the defense" because it established that no other Cambodian refugees, of the "thousands and thousands" that Kanly knew, "other than [Chhuon had] ever committed murder, because it's just totally against the Cambodian people." The prosecutor also reminded the jury of Chhuon's father's testimony that he was Buddhist, "that Buddhists have an absolute reverence for human life, and he indicated that he did his best to teach his children that absolute reverence for human life."

Today's opinion says the prosecutor's questioning and comments fell within his broader argument "that Chhuon's childhood experiences did not justify or otherwise explain his later crimes" (maj. opn., *ante*, at p. 101) and were "a response to a highly evocative and emotional presentation from the defense" (*id.* at p. 93). But that context does not efface the violation here. The prosecutor was free to argue that other refugees from Cambodia, including members of Chhuon's own family, did not commit these kinds of crimes. The prosecutor was also free to argue that Chhuon's childhood, though burdened by war and displacement, included exposure to positive influences and values. What the prosecutor could *not* do was to essentialize Cambodian identity into a cultural or religious monolith and then argue that Chhuon purportedly fell short of behaving as a good Cambodian or Buddhist should. That extra layer — that "you Cambodian people have been such a wonderful people" because of "Buddhism"; that murder is "just totally against the Cambodian people"; that " 'one of the most important things about Buddhism is a reverence for all life' " and that Chhuon's

actions defied not only the law but also that tenet of Buddhism — was gratuitous and impermissible in responding to the defense evidence of Chhuon's difficult childhood. The prosecutor was not merely answering defense evidence when he invoked Cambodian identity and Buddhism as standards for assessing Chhuon's transgressions. He affirmatively leveraged that framework in disparaging Chhuon's character and arguing that Chhuon deserved death.

In sum, I do not disagree that the prosecutor's questions and argument were commentary about how rare it is for people who experience childhood trauma to later commit murder. At the same time, the prosecutor's approach included ethnic overtones that essentialized Cambodian identity and conflated it with Buddhism. Again, both things can be true. Whether intended or not, this line of argument suggested that Chhuon's conduct and character were to be evaluated against a Cambodian standard or Buddhist standard, and that Chhuon's actions were especially blameworthy because they were a betrayal of the religious beliefs and identity associated with being Cambodian. It does not matter that the prosecutor "never referred to 'model' or 'deviant' immigrants" (maj. opn., *ante*, p. 102) or that the prosecutor was simply commenting on the record (*id.* at p. 87). What matters is how the prosecutor's argument would come across "to an objective observer," whether or not the prosecutor had discriminatory intent, and whether the argument "explicitly or implicitly appeals to racial bias." (§ 745, subd. (h)(4).) The prosecutor's repeated references to Chhuon's "culture, ethnicity, [and] national origin" constitute " '[r]acially discriminatory language' " that "appeals to racial bias" within the meaning of the RJA. (*Ibid.*)

The Legislature stated plainly:  "When courts recognize only the most egregious, historic manifestations of racism, they allow present-day racism to go uncorrected."  (Stats. 2025, ch. 721, § 1, subd. (d).)  Unfortunately, today's decision is another example of a court "fail[ing] to find . . . a violation in cases where individuals involved in the prosecution or investigation have . . . made gratuitous references to nationality, race, or immigration status."  (*Id.*, subd. (c).)  The Legislature made clear its intent that courts break with the past and heighten their vigilance.  I would heed the Legislature's intent and hold that the RJA was violated here.  And as to whether the violation was harmless, "a typical weighing of the evidence that we apply when assessing prejudice" (maj. opn., *ante*, at p. 86) misapprehends the nature of the violation.  Because it is reasonably possible that the prosecutor's cultural argument "shift[ed] the entire frame through which jurors evaluate[d] the [penalty phase] evidence" (*People v. Bankston*, *supra*, __ Cal.5th at p. __ [p. 12] (conc. opn. of Liu, J.)), I cannot conclude beyond a reasonable doubt that it did not prejudice the jury's "moral and normative sentencing function" (*id.* at p. __ [p. 29] (conc. opn. of Evans, J.)).  Accordingly, Chhuon's death judgment must be reversed, along with defendant Samreth Sam Pan's judgment in its entirety.

**LIU, J.**

**We Concur:**

**EVANS, J.**
**JENKINS, J.** *

---

* Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  People v. Chhuon and Pan

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**


_____

**Opinion No.** S105403
**Date Filed:** June 1, 2026

_____

**Court:**  Superior
**County:**  Los Angeles
**Judge:**  Robert J. Perry

_____

**Counsel:**

Michael J. Hersek, Mary K. McComb and Galit Lipa, State Public Defenders, Alexander Post, Assistant Chief Counsel, Denise Anton, Kent Barkhurst, Erik Levin and William Whaley, Deputy State Public Defenders, Yesenia A. Sandoval and Hannah K. Song for Defendant and Appellant Run Peter Chhuon.

Sean K. Kennedy and Priscilla Ann Ocen for the Center for Juvenile Law & Policy and the Loyola Anti-Racism Center at Loyola School of Law as Amici Curiae on behalf of Defendant and Appellant Run Peter Chhuon.

Shaleen Shanbhag; and Joseph Doyle for the Fred T. Korematsu Center for Law and Equality at the University of California, Irvine School of Law, the Center for Law, Equity and Race at Northeastern University School of Law, the Center on Law, Race & Policy at Duke University School of Law, the Center for Civil Rights and Critical Justice at Seattle University School of Law, the Center for Security,

Race and Rights at Rutgers Law School, the Gibson-Banks Center for Race and the Law at the University of Maryland Francis King Carey School of Law, the Center on Race, Inequality, and the Law at New York University School of Law, Devon Carbado, Rachel D. Godsil, Jerry Kang and L. Song Richardson as Amici Curiae on behalf of Defendant and Appellant Run Peter Chhuon.

Claudia Van Wyk, Megan Byrne; Avram Frey and Neil Sawhney for the American Civil Liberties Union Foundation, the ACLU of Northern California, the ACLU of Southern California, the ACLU of San Diego and Imperial Counties, the Habeas Corpus Resource Center and the California Appellate Project-San Francisco as Amici Curiae on behalf of Defendant and Appellant Run Peter Chhuon.

Joseph F. Walsh, under appointment by the Supreme Court, for Defendant and Appellant Samreth Sam Pan.

Orrick, Herrington & Sutcliffe, Nathan D. Shaffer and Amanda H. Schwartz for Assemblymember Ash Kalra as Amicus Curiae on behalf of Defendants and Appellants.

Kamala D. Harris, Xavier Becerra and Rob Bonta, Attorneys General, Gerald A. Engler, Lance E. Winters and Charles C. Ragland, Chief Assistant Attorneys General, James William Bilderback II, Assistant Attorney General, Dana Muhammad Ali, Colleen M. Tiedemann, Joseph P. Lee and Louis W. Karlin, Deputy Attorneys General, for Plaintiff and Respondent.

Summer Stephan, District Attorney, Linh Lam, Valerie Ryan, Karl K. Husoe and Ronald A. Jakob, Deputy District Attorneys, for the San Diego County District Attorney as Amicus Curiae on behalf of Plaintiff and Respondent.

Dan Dow, District Attorney, and Richard J. Sachs, Deputy District Attorney, for the Office of the District Attorney for the County of San Luis Obispo as Amicus Curiae.

Kent S. Scheidegger for the Criminal Justice Legal Foundation as Amicus Curiae.

Gregory D. Totten and Philip P. Stemler, Deputy District Attorney (San Bernardino), for the California District Attorneys Association as Amicus Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Alexander Post
Assistant Chief Counsel
1111 Broadway, 10th Floor
Oakland, CA 94607
(510) 267-3300

Joseph F. Walsh
Attorney at Law
P.O. Box 270
Covina, CA 91732
(626) 967-8732

Joshua A. Klein
Deputy State Solicitor General
1515 Clay Street, Suite 20000
Oakland, CA 94612
(510) 879-0756

Louis W. Karlan
Deputy Attorney General
300 South Spring Street
Los Angeles, CA 90013
(213) 269-6121